WILLO V. NEWMAN, *Appellant*, v. MARGARET F. SMITH, AS EXECUTRIX OF THE ESTATE OF L. W. SMITH, DECEASED, *Appellee.*

Opinion filed June 10, 1918.

Petition for Rehearing granted August 12, 1918.

1.  Under the statute every adult person "being of sound mind" may dispose of property by a duly executed will; and when such a person duly executes a will it should be made effective when it does not clearly appear that the free use and exercise of a "sound mind" by the testator in executing the will was in fact prevented by deception, undue influence or other means or that the disposition of the property is contrary to law, otherwise the right given by the statute to dispose of property by will would be thwarted.

2.  In the making of a will a "sound mind" comprehends ability of the testator to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed.

3.  The free use and exercise of a "sound mind" in making a will may be prevented in many ways; but if a testator has a "sound mind" when he makes a will, its free use and exercise will be assumed until the contrary clearly appears.

4. In proceedings seeking a revocation of the probate of a will under the statute the court is required to decree "according to the law and justice of the case." This has reference to ascertaining whether the will duly expresses the free and lawful intent of a competent testator.

5. While findings of a fact by a county judge upon conflicting evidence should ordinarily not be disturbed on appeal to the circuit court where there is ample evidence to sustain the finding, yet where the county judge misapprehended the legal effect of the evidence as an entirety, and, in a case of this character, if the finding is not "according to the law and justice of the case" as required by the statute as well as by the general principles of law, the finding of the county judge should not be sustained merely because there is evidence that it is contradicted, on which the finding may be predicated.

6. Where the finding of a trial judge is contrary to the legal effect of the evidence on the issues made, the Appellate Court should reverse the finding even though the trial judge personally saw and heard the witnesses testify and even though there were conflicts in the testimony, and there was some evidence tending to support the finding. Where the Circuit Court reverses a decree of a county judge in a will contest on the evidence, the Supreme Court will affirm the decree of the Circuit Court if it accords with the legal effect of the evidence.

7. While the apparent injustice of a will may be considered in determining the testamentary capacity of the testator and whether he was unduly influenced in making the will, yet a person of sound mind has a legal right to exclude his only child from benefits under his will, and the facts and circumstances in evidence do not show that the testator, in this case an adult business man, was not competent to exercise and did not freely exercise his legal right under the statute to dispose of his property by will.

An Appeal from the Circuit Court for Hillsborough County; F. M· Robles, Judge.

Decree affirmed.

*C. C. Whitaker and James F. Glen,* for Appellant;

*E. B. Drumright,* for Appellee.

WHITFIELD, J.—The transcript herein shows that on December 5, 1914, the last will and testament of L· W. Smith was field in the office of the County Judge of Hillsborough County, Florida; that on December 7, 1914, it was duly proved for probate by W. F. Himes, a subscribing witness, who made oath that he verily believes said paper writing to be the last will and testament of said testator; and on the same day it was by the County Judge "ordered that the same be allowed as proved, and admitted to record." Letters testamentary were on the same day issued to Margaret F. Smith, the testator's widow, the will being as follows:

"IN THE NAME OF GOD, AMEN:

KNOW ALL MEN BY THESE PRESENTS, that I, L. W. Smith, of the City of Tampa, County of Hillsborough, State of Florida, being of sound mind and disposing memory, do by these presents make, publish and declare the following as and for my last will and testament, hereby revoking any and all previous testamentary disposals of every kind and character, namely:

"FIRST. It is my will and I direct that all my just debts and funeral expenses be paid by my Executrix as soon after my death as possible.

"SECOND. I give, devise and bequeath to my beloved wife, Margaret F. Smith, all of my property, whether, real, personal or mixed, of every kind or character whatsoever.

"THIRD. I nominate and appoint my beloved wife, Margaret F. Smith, as the Executrix of this my last will and testament, directing that no bond or security of any kind or character be required of her·

"FOURTH. I authorize and empower the Executrix of my will to sell, dispose of and convey all property of every kind and character which I may own at the time of my death, for such price and on such terms as to my said Executrix seem reasonable and proper.

"IN WITNESS WHEREOF, I have signed, sealed, published and declared this instrument as my last will and testament in the City of Tampa, Florida, on this 27th day of February, A. D. 1913.

L. W. SMITH     (Seal)

SIGNED, SEALED, PUBLISHED AND
DECLARED BY L. W. Smith, the
testator above named, as and
for his last will and testament
in the presence of us, who, at
his request, and in his presence and in the presence of
each other, have hereunto set
our names as subscribing witnesses thereto.

W. F. Himes,
Deane Hamilton."

On January 26, 1915, the following petition was filed before the County Judge:

"In the County Judge's Court of Hillsborough County, Florida.

IN RE Estate of L. W. Smith.

"To Hon. E. V. Whitaker, County Judge of Hillsborough County, Florida:

"The petition of Wilo V. Newman would respectfully show unto the Court as follows:

"That she is the daughter of L. W. Smith, deceased, and his only child and sole heir at law.

"That heretofore, to-wit, on the 7th day of December, A. D. 1914, there was admitted to probate in this Honorable Court an instrument, purporting to be the last will and testament of the said L. W. Smith, dated February 27th, 1913, whereby all of his property was purported to be bequeathed to Margaret F. Smith, his widow, and whereby she was purported to be appointed as Executrix of his estate, and in pursuance of the probate thereof the said Margaret F. Smith is now acting as Executrix of the estate of the said L. W. Smith.

"That the said instrument was not in truth and in fact the genuine will of the said L. W. Smith, nor did the same truly express the purpose or intention of the said L. W. Smith in respect to the disposition of his property, for the reason that while the said instrument was signed by the said L. W. Smith, he was at the time of excution thereof in a hospital in the City of Tampa, and so under the influence of opiates and anodynes as to be incapacitated from making a testamentary disposition of his property, and it was at all times prior to the execution of said

instrument and at the time of the execution thereof the purpose and intention of the said L. W. Smith to make a testamentary disposition of his property whereby your petitioner, his daughter, should receive one-half thereof, and the said Margaret F. Smith, your petitioner's step-mother, the remaining one-half thereof, and the execution of the said instrument so admitted to probate was secured by undue and improper influence exercised upon the mind of the said L. W. Smith while he was so in the hospital and under the influence of opiates and anodynes, and not possessed of sufficient mental vigor to withstand such improper and undue influence.

"Wherefore your petitioner prays that the probate of the said instrument as the last will and testament of the said L. W. Smith may be revoked in accordance with the statute in such cases wade and provided, and that a copy of this petition together with a citation to appear and answer the same may be served upon the said Margaret F. Smith as Executrix named in the said instrument.

"And your petitioner will ever pray, etc.

James F. Glen,<br>C. C. Whitaker,<br>Attorneys for Petitioner."

The following answer was filed:

"IN THE COUNTY JUDGE'S COURT FOR HILLSBOR-
OUGH COUNTY, FLORIDA.

In Matter of Estate of
L. W. Smith, Deceased·

"The answer of Margaret F. Smith, executrix of the last will and testament of L. W. Smith, deceased, to the petition of Wilo V. Newman, contestant.

"Now comes Margaret F. Smith, executrix as aforesaid, in her own proper person and through her counsel Drumright & Dunn, and for her answer to the petition of Wilo V. Nekman heretofore filed in this cause, says:

"FIRST. That she admits on the 7th day of December, 1914, there was admitted to probate in the above court an instrument purporting to be the last will and testament of L. W. Smith dated Feb. 27, 1913, and that the said will devised and bequeathed to Margaret F. Smith, his widow and this respondent, all of his estate, legal and equitable.

"SECOND. This respondent further answering says that the said instrument admitted to probate was the last will and testament of L. W. Smith; that the same was legal and did appoint this respondent his executrix, and did make disposition of all his property, real and personal, and did constitute this respondent his sole legatee therein.

"THIRD. This respondent further answering denies the allegations contained in the said petition and on the contraray thereof says that the said instrument was the genuine will of L. W. Smith executed with all the formalities and requirements of law; that the said respondent denies that the same was executed by the said L. W. Smith while under the influence of opiates to such a degree as to incapacitate him from making a testamentary disposition of his property. This respondent further answering says that the said L. W. Smith at the time of making said will was fully advised as to the contents thereof and freely and voluntarily executed the same without coercion, duress or improper influence on the part of this respondent or any other person or persons. And this respondent denies specifically the exercise on

her part of any duress or improper influence in securing the execution of the aforesaid will, or of any connivance or any improper practice in securing the same.

"And having fully answered the said petition this respondent prays that the same may be dismissed at the cost of the petitioner herein, and that this respondent may be directed to complete the full administration of the said estate under her power as executrix therein contained.

Margaret F. Smith,<br>Respondent."

Testimony was taken and on March 24, 1916, the County Judge entered the following decree:

## "IN THE COUNTY JUDGE'S COURT OF HILLSBOROUGH COUNTY, FLORIDA.

IN RE: Will of L. W. Smith:

"The matter of the petition of Willo V. Newman praying for the revocation of the instrument heretofore admitted to probate as the last will and testament of L. W. Smith, together with the answer of Margaret F. Smith, as executrix, to the said petition having come on to be heard, and the court having heard the evidence of the respective parties and the argument of counsel for the respective parties and being now advised of its opinion in the premises, it is thereupon, ordered, adjudged and decreed that the instrument heretofore admitted to probate as the last will an testament of L. W. Smith, on the 7th day of December, A· D. 1914, is not the last will and testament of the said L. W. Smith, and that probate of the said instrument be and the same is hereby revoked.

"The said Margaret F. Smith, as executrix, having given notice in the open court at the time of pronouncing this

decree of her appeal, therefrom, and the said appeal having been filed by her in writing, it is ordered that the same shall be recorded immediately following after and in the same book where record is made of this decree.

"Ordered, Adjudged and Decreed at Tampa, Florida, on this the 24th day of March, A. D. 1916.

[SEAL]                                        E. V. Whitaker,
                                                  County Judge."

Margaret F. Smith took an appeal to the Circuit Court, and that court rendered the following opinion and decree:

"IN THE CIRCUIT COURT OF HILLSBOROUGH
COUNTY, FLORIDA.

Margaret F. Smith, as Executrix of the Last Will and Tesament of L. W. Smith, Deceased........................Appellant,

vs.

Willo V. Newman, Contestant.............................................Appellee
    Appeal from a judgment in the County Judge's
    Court for Hillsborough County, Florida, revok-
    ing the probate of the last will and testament of
    L. W. Smith .Deceased, and adjudging that the
    same is not the last wil' and testament of the
    said L. W. Smith, Deceased.

REVERSED.

OPINION OF THE COURT:

"This cause coming on for a hearing before the court, upon the transcript of record from the County Judge's Court of Hillsborough County, Florida, to review a final judgment and decree therein finding that an instrument therefore admitted to probate as the last will and testament of L. W. Smith, deceased, was not, in fact, the last

will and testament of the said L. W. Smith, and revoking the probate thereof.

"The appellant has filed herein several assignments of error, but such assignments amount, in substance, to an attack upon the sufficiency of the evidence to support the findings of the lower court, and these are to be treated separately. The questions therefore, presented by this appeal are:

"1.   Was there legally sufficient evidence tending to show that the testator was not possessed of sufficient capacity to make a valid deed or contract at the time it was executed; or

"2.   Was the will in question obtained by fraud, duress or undue influence, so that the same did not express the real intent of the testator?

"There is no direct or positive evidence that any undue or improper influence was, in fact, exercised; and the court is of the opinion that the circumtsances shown are not sufficient to raise the presumption of the exercise of any undue or improper influence.   See Epling v. Hutton, 121 Ill. 555, 13 N. E. 242.

"The court is further of the opinion that there was not sufficient evidence to sustain a finding and judgment that the testator at the time of the execution of the will in question, was not of sufficient mental capacity to execute a valid will.   The only probative facts testified to in connection with the time of the execution of the will in question relate to the physical condition of the testator, and it is only by inference that any effect upon his mind is attempted to be shown.   It seems to have been established that at the time in question L. W. Smith was suffering intense pain; that he was greatly alarmed over his

physical condition, and apprehensive of death; and that he had been taking narcotics for the purpose of relieving pain; that he was a patient suffering from disease of the arteries, which tended to impoverish the blood and in consequence thereof reduce the brain power. The contention that the disease in question was any more calculated to reduce the mentality of the patient than any other disease which caused a patient suffering was successfully met by competent evidence. The contention that the narcotics taken had the effect of destroying or impairing his brain powers was likewise disputed by competent evidence in the case. And to hold that a person who was suffering great pain and was possessed by a great fear of impending death, and therefore, incapable of making a will, would be, in effect, to hold that the majority of wills executed were not valid. The only testimony upon which a finding that the testator lacked the necessary capacity to make a will is that of one of his physicians, and this testimony is afterwards disputed by another of the attending physicians. The testimony of the physician offered by the contestant does not go to the extent of furnishing facts showing what the manifestation of the testator's mental operation was. He does not testify to any conduct or speech that tends to show mental incapacity. His opinmental condition of a person in the physical condition in which the testator was at the time of the execution of the will, and in accordance with such opinion this condition prevailed for a considerable length of time, both before and after the execution of the will. As opposed to such evidence there is the testimony of another attending physician, who at no time discovered, in fact, any lack of mental power on the part of the deceased, and saw no manifestation by word or deed that any failure of mental powers, in fact, occurred. Numer-

ous witnesses testified that during the period of time in which the testator was in the hospital he displayed his usual mental power, and as conclusive of the fact that he knew what he was doing at the time of the execution thereof, he subsequently retained this will in his possession, spoke to numerous parties of the contents thereof, and declared in effect the disposition made in the instrument attempted to probate was, in fact, his intention in reference to the disposition of his property.

"Every man is presumed to be in possession of his mental powers until the contrary is shown, and to possess sufficient capacity to make a will; and in order to make such a showing there must be at least some evidence from which it can be found, either from his speech or his conduct that his mental powers have become impaired to the extent of depriving him of that degree of discernment, judgment and memory which the law requires. See Horner v. Buckingham, 64 Atlantic, 41.

"I am of the opinion that no evidence was produced upon the trial of this cause upon which the trial court was justified in finding either that the will in question was obtained by undue or improper influence or during a period when the testator did not possess sufficient mental capacity to make a will.

"The finding and judgment of the lower court are reversed, and this cause remanded to the County Judge's Court for Hillsborough County, with directions that the petition of the caviator be denied and her contest dismissed; and for further proceedings in the lower court in accordance with the judgment and findings of this decree; and the costs of this appeal to be taxed against the appellee.

"Done, ordered, adjudged and decreed at Chambers, this 13th day of October, A. D. 1916.

F. M. Robles,

"Judge of the Circuit
"Court of the Thirteenth Judicial
Circuit of Florida."

From this decree the contestant, Willo V. Newman, appealed to this court. See Sections 5, 11, 17, Art. V, Constitution; Sec. 1710, Gen. Stats. 1906, Compiled Laws, 1914; Sweetser v. Ladd, 52 Fla. 663, 41 South. Rep. 705; Brown v. Avery, 63 Fla. 355, 58 South. Rep. 34, Ann. Cas. 1914A, 90.

The errors assigned here are as follows:

"1. The Circuit Court erred in reversing the judgment of the County Judge of Hillsborough County, Florida, on the ground that the witnesses appeared personally before the said County Judge, and there was sufficient evidence to sustain and warrant his finding and judgment.

"2. The Circuit Court erred in reversing the judgment of the County Judge of Hillsborough County, Florida, on the ground that the evidence was conflicting, and the Circuit Court was not warranted in setting aside the judgment based upon such conflicting evidence.

"3 The Circuit Court erred in finding as a fact that no circumstances were disclosed sufficient to warrant a presumption of the exercise of undue influence.

"4. The Circuit Court erred in finding as a fact that there was not sufficient evidence to sustain a finding and judgment that the testator, at the time of execution of the will, was not of sufficient mental capacity to execute a valid will.

"5. The Circuit Court erred in finding as a fact that it was conclusively established that the testator retained the will in his posession and spoke to numerous parties of the contents thereof and declared the disposition made by the instrument was in fact his intention in reference to the disposition of his property.

"6. The Circuit Court erred in finding as a fact that the tetsimony of the testator's attending physician was founded upon what such physician thought ought to be the mental condition of the testator, having reference to his physical condition at the time of execution of the will.

"7. The Circuit Court erred in finding as a fact that no evidence was produced upon which the court of original jurisdiction was justified in finding that the will was procured by undue or improper influence, or during a period when the testator did not possess sufficient mental capacity to make a will."

The sections of the General Statutes, 1906, bearing upon this controversy are as follows:

"2269. Every person of the age of twenty-one years, being of sound mind, shall have power by last will and testament in writing to devise and dispose of his lands, tenements and hereditaments, and of his estate, right, title and interests in the same in possession, remainder or reversion, and of personal property."

"2272. Every last will and testament disposing of real estate shall be signed by the testator, or by some other person in his presence and by his expressed directions, and shall be attested and subscribed in the presence of the said testator by two or more witnesses, or else it shall be utterly void and of non--effect."

"2274. All wills of personal property shall be in writing, and signed by the testator or some other person in his presence, and by his express direction."

"2279. In case any person interested shall desire to contest the probate of any will offered for probate he may do so in the following manner: He shall file, with the county judge his petition in writing setting forth in a plain, direct and concise manner the facts constituting the grounds of such contest, and praying that such will be not admitted to probate. If he be apprehensive that the will may be admitted to probate without his knowledge, he may file in the office of the county judge a caveat, and after the filing of the same the county judge shall not admit the will to probate until he shall have given at least ten days' notice to the caveator, or some other person to be named in the caveat, if such caveator, or some other person be found in the county."

"2284. Last wills and testaments, both of real and personal property, may be admitted to probate upon the oath of any person appointed executor thereto, or where no executor is appointed, or where the executor is interested in the estate bequeathed, or any other credible person having no interest under the will, that he verily believes the writing exhibited as the last will and testament to be the true last willl and testament of the deceased. Probate may be granted in term or vacation by the county judge."

"2286. The probate of wills so far as concerns any personal estate shall be conclusive as to the validity of the will of which it is the probate, and the probate of wills so far as concerns real property shall be prima facie evidence of the validity of wills of which it is the probate,

in any suit or cotnroversy in relation to or concerning the property thereby devised or bequeathed."

"2288. Any person interested may make application to a court in which the probate of any will may have been granted for a revocation of such probate, by petition to the said court, which petition shall set forth the ground upon which revocation is demanded; and a copy thereof, together with a citation to appear and answer the same shall be served upon the executor or administrator with the will annexed at least ten days before the time to which such citation may be returnable, and the party cited to answer the said petition shall file his answer to the same on or before the expiration of the said ten days; and the said court shall, upon the petition and answer of the parties, and the proof adduced by them, which shall in all cases be taken as in case of contests before probate as provided in Section 2279, confirm or revoke the said probate according to the law and justice of the case."

"Appeals from the county judge to the circuit court in matters pertaining to his probate jurisdiction and in the management of the estate of infants, and from the circuit court to the Supreme Court in such matters arising before the county judge, shall be governed in all respects by the law and rules regulating appeals in chancery." Section 1710, Gen. Stats., 1906, Compiled Laws, 1914.

Under the statute every adult person "being of sound mind" may dispose of property by a duly executed will; and when such a person duly executes a will it should be made effective when it does not clearly appear that the free use and exercise of a "sound mind" by the testator in executing the will was in fact prevented by deception, undue influence or other means or that the disposition of the property is contrary to law, otherwise the right

given by the statute to dispose of property by will would be thwarted. The statute provides that wills shall be admitted to probate upon the oath of one of designated classes of persons "that he verily believes the writing exhibited as the last will and testament to be the true last will and testament of the deceased;" and that the probate of a will so far as concerns personal estate shall be conclusive as to the validity of the will, and as to real property, the probate shall be *prima facie* evidence of the validity of the willl, in any suit or controversy in relation to or concerning the property thereby devised or bequeathed. Provision is made in the statutes for contesting the probate of a will offered for probate and for proceedings seeking a revocation of the probate of a will after probate has been granted, in which latter case the court shall "confirm or revoke the said probate according to the law and justice of the case." Sec. 2288, Gen. Stats. 1906, Compiled Laws, 1914. In the making of a will a "sound mind" comprehends ability of the testator to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed. The free use and exercise of a "sound mind" in making a willl may be prevented in many ways; but if a testator has a "sound mind" when he makes a will, its free use and exercise will be assumed until the contrary clearly appears. In proceedings seeking a revocation of the probate of a will under the statute the court is required to decree "according to the law and justice of the case." This has reference to ascertaining whether the will duly expresses the free and lawful intent of a competent testator. While findings of fact by a trial judge upon con-

flicting evidence should ordinarily not be disturbed on appeal where there is ample evidence to sustain the finding, yet where the trial judge misapprehended the legal effect of the evidence as an entirety, and, in a case of this character if the finding is not "according to the law and justice of the case" as required by the statute as well as by the general principles of law, the finding of the trial judge should not be sustained merely because there is evidence that is contradicted, on which the finding may be predicated. See Perez v. Bank of Key West, 36 Fla. 467, 18 South. Rep. 590; Peck v. Osteen, 37 Fla. 427, 20 South. Rep. 549; Alvarez v. Bowden, 39 Fla. 450, 22 South. Rep. 718; Ross & Co. v. Walker, 44 Fla. 704, 32 South. Rep. 934; Howard v. Sheffield, 73 Fla. 358, 74 South. Rep. 488; McGill v. Chappelle, 71 Fla. 479, 71 South. Rep. 836.

Where the finding of a trial judge is contrary to the legal effect of the evidence on the issues made, the appellate court should reverse the finding even though the trial judge personally saw and heard the witnesses testify and even though there were conflicts in the testimony, and there was some evidence tending to support the finding. See Cowen v. Bean, 159 Wis. 67, 149 N. W. 745. This court will affirm a decree of the circuit court reversing on the evidence a decree of the county judge, so as to make the decree such as "ought to have been given." Sec. 1707, Gen. Stats.

The contestant alleged, and undertook to prove, that the testator was so under the influence of opiates and anodynes as to be incapacitated from making a testamentary disposition of his property, and that this will was secured by undue and improper influences exercised upon the mind of the testator.

It appears that the testator, L. W. Smith, and his wife, Margaret F. Smith, each had a daughter by former marriages; that his daughter and his wife's daughter were both married; that when testator's daughter was about one year old she was taken by her aunt who raised her, she never having lived with her parents; that the testator was divorced from his daughter's mother about nine years after the daughter was taken by her aunt; that his daughter lived with her husband, George R. Newman, in another state. There is testimony that when growing up the testator did not see much of his daughter and gave her very little during his life, and that the testator stated after his will was made that when he and his former wife "parted" the daughter "went with her mother" and he gave them everything he had. After the marriage of the testator's daughter he visited her, and she and her husband several times visited her father and his then wife, the appellee, one of these visits being of about two months' duration, after testator left the hospital in which he made his will. Testator stated on several occasions in previous years that he would remember his daughter in his will. Several years before his death, which occurred in November, 1914, he wrote letters to his daughter, in one of which, dated March 3, 1907, he addressed her as "My Dear Wilo, and in the letter wrote: "Glad you made new and good resolutions the first of the year. Hope you will stick to them and not fuss with me so much but with all your faults I love you better than I do any one else on earth, so don't worry about me not loving you. Sorry you all did not come down this winter. By all means make arrangements to come next winter. With love to you and George, I am your Poor old Pappy." In another letter dated May 4, 1904, he addressed her as "My dearest and only Baby." "For that is what you are and no one

else is or will ever be entitled to that name," and in the letter wrote: "If you are mad with me I love you just the same or more than ever. You need pay no attention to what little I give other people. Your time will come some of these days in the near future and in a substantial manner." The other letter is dated April 19, 1908, and contains no special message of affection.

It also appears that the testator had not been on friendly terms with L. L. Thrower, the husband of his stepdaughter, and that in the third letter to his daughter above mentioned he referred to his wife as "the old lady" who was then traveling in Europe, and stated that "I will have lots of fun yet while the old cat is away, (*The Rats will Play*)" and it further appears that testator's wife had a large income while his daughter and her husband were relatively poor.

There is also testimony by the testator's son-in-law that while he and his wife were visiting her father he gave to his son-in-aw a list of his property and told him to keep it; that it would be of much benefit to his daughter, and that the testator afterwards enquired if he had kept the list.

There is also testimony that the testator had previously made a will in which he perhaps divided his property equally between his wife and his daughter.

The will here contested was executed while the testator was at a hospital for a surgical operation.

Dr. John S. Helms, on behalf of the contestant, testified: "Q. Doctor what was the condition of L. W. Smith when he was in the hospital, physically? What was his physical condition? A. Well, his physical condition was

rather bad at that time. He had a disease of the blood
vessels which affected his entire physical constitution
and particularly affected the leg that we operated on. It
was a disease of the lining of the blood vessels causing
the vessels to close up and affecting the nutrition of the
parts affected and he had gangrene of his foot and leg as
a result which needed amputation. Q. Was he suffering
pain at the time he was in the hospital? A. Yes, he suf-
fered a good deal of pain. Q. What was his mental con-
dition, Doctor? A. Well, ever since I have known Mr.
Smith I have always observed that he was a man that is,
from my dealing with him about his ailments—that he
was quite a nervous man and he always exhibited an in-
ordinate fear or apprehension about his physical condi-
tion. He particularly had a great fear of death and he
had this fear of death in rather an exaggerated form at
the time he was in the hospital. Q. Do you remember
the date of the first operation? A. February 24, 1913.
Q. Please state what that first operation consisted of.
A. When I first saw Mr. Smith and went over his case it
was my idea at that time that his disease had probably
only affected the foot and the great toe. He had some
gangrene in the great toe and I thought at that time it
was only necessary to amputate his great toe so I went
over the ground with him and told him we would have to
amputate his toe and he consented to permit that to be
done and went to the hospital for that purpose, and after
he was anaesthetized I made an incision in the toe for the
purpose of amputating it and found that the circulation
of the toe beyond the area of gangrene was insufficient
and there would probably be a slough if I made the ampu-
tation there, and not having his permission to do any-
thing further I had to suspend further work until such
time as I could take up the matter with him and further

explain his condition, so the first operation amounted only to an amputation, really, of the great toe part of his foot. Q. You then allowed him to come out of the influence of the anaesthetic and explained the situation to him? A. Yes. Q. And what did he say, Doctor? Did he give you authority to operate again? A. Yes, he gave me authority to proceed with whatever operation I thought necessary and would be for his best interests. I took up the matter not only with him but with Mrs. Smith also and they agreed that I should proceed later with whatever my judgment as surgeon indicated. Q. After you explained to him the necessity for this second operation did his mental condition become any better between that time and the second operation? A. Well, out of the nature of things he necessarily was more frightened about his condition for he was under the impression at first that the matter was not so severe and when he found that another operation had to be done, and probably an amputation of the thigh, his fear necessarily was increased and he was more agitated. Q. What was the interval of time between the first and the second operation? That second operation was done on the 22nd of March if I am not mistaken about it. Q. Did he continue in the hospital during the period between the two operations? A. I believe he did. Q. Can you state whether it was necessary to administer opiates during that period and what opiates were administered to him on that date? A. Yes they were administered to him under my direction and orders during that period. The fact is, he was suffering a great deal of pain and was almost uncontrollable and had to have narcotics. Q. What opiate was administered, Doctor? A. Morphine. Q. Can you state on the date of the 27th of February, 1913, how many doses of morphine were administered to him? A.

On that date? Q. Yes. A. Well, he had at two o'clock in the morning a quarter grain of morphine given hpodermatically, and at 9:30 he had a quarter of a grain of morphine and at six that evening another quarter grain of morphine. Q. Had you been causing morphine to be administered to him prior to that date? A. Yes. On the 26th he had morphine. Q. How many times on the 26th? A. He had morphine on the 25th—the fact is, it had been necessary to give him more or less morphine the whole time he was there; that is, after the first operation.

"By Mr. Phillips—What date is that, the 26th? A. The 25th he had morphine at three o'clock in the after-noon, a quarter of a grain, and on the 26th he had morphine at nine o'clock in the morning, two o'clock in the afternoon and seven o'clock in the evening, and the 27th at two o'clock in the morning, and so on. Q. (Mr. Glen continuing) According to your observation, Doctor, how acute were his mental faculties during the period after the first operation and up to and including the 27th day of February, 1913? A. During that period of time he was suffering pain and was seized with his inordinate fear, and his whole concern, so far as my observation, was upon his physical condition, whether or not he would get well, and necessarily he was incapable of any particular mental effort. Q. I will ask you this question Dr. Helms: In your opinion was L. W. Smith, on the 27th day of February, 1913, at the time he is said to have made his will in the hospital, in such mental and physical condition as to be able to comprehend the situation and character of his property, the nature of his obligations to others, the persons who had legal or natural claims upon him, who should be the objects of his bounty, and, keeping these matters in his mind, capable of making a testa-

mentary disposition of his property as his own judgment approved? A. As I stated before, Mr. Smith was in a state of inordinate fright and very uneasy as to his condition; had a great fear of death, and his whole concern was centered on his own physical condition as to whether or not he would get well. He was more or less under the influence of narcotics at that time which would affect his mental operations. He was suffering from a disease of the blood vessels which affected the nutrition of his whole body. While it affected particularly his leg and foot it necessarily affected his whole body. He was not at that time, in my judgment, capable of any particular thought about anything aside from his own condition and was not capable of really getting a measure of his own physical feeling at that time and he certainly, in my judgment, was not in a normal mental state. I would necessarily have to conclude that he was at least partially incapacitated to take into consideration all these matters, and he was furthermore in such a state of mind that he was more or less subject to suggestion and therefore easily influenced by those who were about him that he looked to for help. That is about as definite or clear an answer to that question as I can give without answering yes or no.

ON CROSS.

"Q. Then you want to testify, doctor, that Mr. Smith during the period didn't have sufficient mental capacity to know what he was doing? A. I want to testify that in my judgment—and I want to be fair to everybody in this case—that Mr. Smith was not capable of making a will at that time; he wasn't sufficiently at himself; wasn't sufficiently mentally capacitated to consider a matter of that kind. The fact is, he wasn't capacitated to consider any

act that required mental capacity, in my judgment. Q·
You don't know just exactly what his mental condition
was at the time he signed this will in question? You
didn't see him about that time? A. I wasn't there. I
didn't know he signed a will at that time. Of course his
general mental condition I have described here during
that period. Q. I understand that, but I meant that par-
ticular hour? A: That particular hour I didn't see
him; didn't know he signed a will and didn't know any-
thing about that."

Mr. W. F. Himes, a practicing attorney called by the
contestant testified that on "the afternoon of February
26, 1913, or early in the morning of the next day while I
was at my residence I received a telephone message to the
effect that L. W. Smith, now deceased, was in the Gordon
Keller Hospital and wanted me to come to see him in
order to draw his will. In the morning of February 27,
1913, I came to my office in the Dawson-Thornton Build-
ing, and the office of Thrower Brothres was right across
the hall. The telephone message that I have mentioned
came either from B. K. Thrower, Jr., deceased, or L. L.
Thrower, and I feel quite sure it was B. K. Thrower, Jr.,
and on the morning of February 27th, whoever I received
this telephone message from—and it is my recollection
that it was B. K. Thrower, Jr.,—came into my office and
I had a conversation with him. Somewhere between nine
and ten o'clock on the morning of February 27th, 1913, in
pursuance with a notice I have above mentioned, I went
to the Gordon Keller Hospital to see Mr. Smith. I saw
him in a room in the hospital. He was in bed. There
was no one else present in the room at that time except
a nurse, I have forgotten her name. After the conversa-
tion that I had with Mr. Smith in his room I came back

42—Vol. 77.

to my office and prepared this will for execution. Then in the afternoon, to the best of my recollection somewhere between two o'clock and four o'clock I went to the hospital again to attend to the execution of the will, went to the room where Mr. Smith was, and when I came to the room Mrs. Smith was in the room alone with Mr. Smith. At that time there was no one there except myself, who was a proper witness for the will, and so I state to Mr. Smith and at his direction his nurse who was out of the room was sent for and came into the room. This will was read to Mr. Smith, was signed and executed by him, and was signed and executed by myself and the nurse whose name is signed to it. When the will was executed it is my recollection that it was handed to Mrs. Smith. That is about the transaction. Q. Mr Himes, at the time that you talked to Mr. Smith that morning about his will when you went to see him about nine-thirty or ten o'clock, and also at the time when you went back and read the will to him and had the same executed in the presence of yourself and the other witnesses, did you observe anything either from his conversation or from his manner that would indicate to you that he was not capable of making a will? A. When I entered the room in the morning Mr. Smith was lying in his bed· Apparently he had no difficulty in recognizing me. There was very little conversation on that visit. The — Q. Can you recall the conversation? A. I told Mr. Smith, after speaking to him and expressing my regrets at seeing him in the hospital and the condition he was in, that I had understood he wanted me to come and prepare his will and he replied yes that was true. Whether he then told me what he wanted put in the will or whether I told him what I understood he wanted put in the will I don't remember, but I know aside from the matter of all the property be-

ing given to Mrs. Smith I asked if he wished her to be relieved from the necessity of giving a bond and being made executrix, and he answered in the affirmative. At that time Mr. Smith talked to me more about his physical condition than he did about the details of his will. I remember he told me at that time they had cut into his foot and found he didn't have any blood in it, or circulation, and they would have to cut off his leg, and so on, and in the afternoon when I came back he again recognized me when I came into the room without apparently any difficulty. In the afternoon there was no discussion about anything about the will. I think I did the principal part of the talking· I know I mentioned the necessity for a witness and I know that I read the will and explained it to him and asked him if that was his will and he so declared. Nothing occured at that time to raise in my mind any question about his mental competency. At that time I certainly thought he was competent to make a will or I certainly would not have drawn it or had him execute it. In my opinion there is nothing more reprehensible for a lawyer than to have a man sign a will knowing he was not competent to do so and not conscious of what was going on. As to an opinion on my part as to his mental ability at that time to make a will, I made no study of it other than I have told you and know nothing about what occured except in my presence and I can't say that I undertook to form an opinion. In my judgment an opinion ought to be based on a knowledge of all the facts in order to arrive at a correct conclusion and no such necessity was presented to me or came into my mind at that time.

CROSS EXAMINATION. QUESTIONS BY C. C. WHITAKER.

Q." Mr. Himes, it had been suggested to you by either Mr. Laurence or Mr. B. K. Thrower what he wanted to do and what kind of will he wanted to make, had it?    A. I am quite sure it hadn't been suggested by Mr. Laurence Thrower.    When Mr. B. K. Thrower, Jr. came into my office ·before I went over to the hospital Mr. B. K. Thrower told me what had happened.    I think Mr. Smith had been operated on the day before, and what was to go into this will may or may no have been discussed at that that time, Mr· Whitaker.    I have no recollection sufficient to be positive.

"CONTINUED BY MR. GLEN.

"Q.   As I understand your testimony, you say that the question of Mr. Smith's capacity at that time was not presented to your mind and that you do not undertake now to say whether or not you considered him capable to make an intelligent disposition of his property then?    A. To a certain extent the question of his mental condition at that time was not wholly out of my consideration.    If Mr. Smith had been delirious at the time I went there or any other matter had occurred to present the question to my mind I would have had some occasion to make such observations and investigations as would have led me to reach an opinion.    I am unable to testify as to any matters that go beyond my knowledge and observation.    I have already stated what transpired in my presence.    I certainly don't think it is proper for me to express an opinion based on matters outside of my knowledge.    Q. Well, Mr· Himes, do you feel comepetent from the conversation you had with Mr. Smith and what you observed at

the time of your two interviews with him to express an opinion as to his mental capacity to make an intelligent disposition of his property at that time so as to express his own desires, taking into account the considerations that ought to appeal to any man making a will? A. The last qualification you put on to that question makes it a very difficult question to answer. I don't see how I could be expected to answer the question as it is propounded. I had no conversation with Mr. Smith as to what thoughts were in his mind, or by what reason he was being actuated or controlled. He didn't discuss them with me at all. There was a singular absence of any discussion on those points at all. Q. Did he or not at that time seem to be laboring under very considerable fright as to his physical condition? A. He was in bed. I can't know whether he was frightened or not but I know he was talking about it quite a good deal and at considerable length and there was more discussion about that than about the will in the morning. Q. Isn't it a fact, Mr· Himes, that as far as you could observe from the conversation you had wtih him that was the main subject on his mind, as to his physical condition? A. I don't think I am able to express an opinion on that. I don't know what was on his mind except what he was talking about. He was talking about his physical condition and what had occurred in the way of an operation and what they found in his foot and what a bad condition he was in and that they were going to have to cut off his leg and there was a good deal of talk about that, and as far as the discussion of this will was concerned in the morning, as I recollect it, there was no discussion at all of that matter by Mr. Smith except that he desired this will made and to give all the property to his wife. It may have been that I said to him when I went there that I had been informed that

he desired a will drawn that way; I don't remember; but I know that I raised the question about whether he desired his wife to be relieved from giving bond and to be appointed as executor of his will and he assented to it. I am satisfied Mr. Smith knew me; I am satisfied he knew that the subject matter of a will was under discussion, and I am satisfied he knew he was signing a will in the afternoon. In fact I am positive of that."

Dr. W. J· Lancaster for the defendant testified: "I was associated with Dr. Helms at that time and Dr. Heims operated on Mr. Smith. Q. How often did you visit Mr. Smith during his confinement there in the hospital? A. Well, I counldn't tell you the exact number of times. I went to see him every morning when we made the morning rounds after operations and in the afternoon I used to go over and do the dressing of all the cases operated on by Dr. Helms and his corps of assistants in the hospital, and usually at night; not always at night but nearly always; but at least two or three times a day. Q· Do you know if he had one or more than one operation? A. Two. Q. Do you know what the first operation consisted of? A. The first was just the amputation of the toe. Q. Did you visit him immediately after that time? A. He was operated on that morning and I saw him that afternoon. Q. Did you see him then every day until the second operation? A. Yes; every day he was in the hospital I saw him. Q. Do you know whether or not you or Dr. Helms saw him the more; A. Who, no sir, I wouldn't say which one of us saw him the more. At that time when I was asociated with Dr. Helms in that capacity, I, as a rule, saw most of the patients more than he did. I went over the same number of times he did and in addition went over in the afternoon and did the dressing. I

didn't have any office hours in the afternoon and he did and I went over and did the dressing in the afternoon, and so I usually saw them at least once more than he did. Q. Did you dress Mr. Smith after the operation on the toe? A· I did, yes. Q. And after his leg was amputated? A. Yes sir. Q. You are quite sure that between the two operations you attended him regularly at least once a day? A. Yes sir. Q. I wish you would state whether or not on any of these visits or any time during his illness you observed anything in his conduct or conversation that indicated he was not in his right mind? A. Why, all cases operated on are more or less under excitement, and anaesthesia most always makes all persons so until it is worn off which is usually between 24 and 30 hours. Beyond the usual excitement and anxiety asociated with the operation I did not see anything extraordinary in the condition of Mr. Smith. Q. You frequently conversed with him, did you? A. Yes, every day· Q. If this first operation was performed on the 24th day of February, 1913, and it appears that on the 27th day of February, of the same month, he made his will, would you say the effects of the anaesthetic given him at the time of that operation of the 24th would have been entirely worn away at that time? A. Yes, sir. Q. It has been shown in the evidence that Mr. Smith was given morphine during this period between these two operations. Do you know whether that is a fact or not? A. I wouldn't state definitely whether that was or not. Those things I couldn't carry in my mind this length of time. Patients that suffer after operations are usually relieved if possible by giving morphine or whatever it takes to relieve them. Q. It appears from the testimony here taken from the chart of the 27th, upon which date he made his will, that he was given a quarter grain of morphine at Two

A. M., one at Nine A. M. and another at Six P. M. in the afternoon. Would you say that was a sufficient quantity of morphine to effect his brain powers? A. Effecting him how? Enough to relieve his pain. Q. To effect his powers of discernment; to make him irrational or unconscious of the nature of his acts? A. No Sir, it would not. Q. What is the usual dose of morphine in a case of that kind? A. In the cases of adults a quarter of a grain repeated every four hours if necessary. Q. Doctor, from your visits and obesrvations of L. W. Smith during this period between the time of the two operations, and particularly on the 27th day of February, 1913, three days after the first operation, was he 'in such mental and physical condition as to be able to comprehend the situation and character of his property, the nature of his obligations to others, the persons who had legal or natural claims upon him, who should be the objects of his bounty, and keeping these matters in his mind capable of making a testamentary disposition of his property?' A. I wouldn't state in regard to dates but I would state that two days after his operation he was able to be in full control of his mental powers. Q. And in your opinion was he? A. In my opinion he was. Q. Did you at any time see him when he was not except for the time when he had anaesthetics for purpose of operating? A. No sir, I didn't see him at any time when I thought he did not have his full mental powers. Q. From your previous experience in these institutions and attending people suffering from these complaints and nervous disorders, would you have observed if there had been anything in his conduct or conversation to indicate that he did not have full possession of his mental faculties? A. Yes, I certainly would have observed it. We were especially observant of Mr. Smith's case in the hospital for at the

time of the operation, as I remember, that was a slight—
that is, we weren't exactly sure of the exact cause of that
condition in his foot and we were watching carefully all
conditions that might arise that would give us any clue
at all in regard to his foot, and as far as his mental con-
dition is concerned I never saw anything to indicate that
he wasn't in control of his mental faculties.  Q. At any
time and at all times?  A. At any time I saw him while
he was in the hospital.  Q. Would you say that the giving
of a dose of a quarter of a grain of morphine at Two
A. M., Nine A. M. and Six P. M. would be of sufficient
quantity as to effect the brain powers of the individual
during that period?  A. Not of an adult, no sir.  Q. Are
you in a partnership with Dr. Helms now?  A. No sir.
Q. Are your relations with Dr. Helms friendly or un-
friendly?  A. Why, in a way we are unfriendly and in a
way we are friendly."

Several persons testified that they saw the testator re-
peatedly while in the hospital and during the period of
more than a year after he left the hospital and prior to
his death, and saw no evidence of a failure of his mental
powers.  There is also testimony that the testator several
times stated that he had given all his property to his
wife, and the will was found among his private papers
after his death.

The evidence considered as an entirety does not show
that at the time of making the will the testator was not
"of sound mind," but on the contrary strongly tends to
support a presumption of normal mental condition of the
testator, who appears to have been a successful business
man before and after his hospital experience.  There is
no direct evidence of undue influence having been exerted
so as to prevent the testator from exercising a free will

and intent in disposing of his property as he desired. See *In re* Weber's Estate, 401 Mich. 477, 167 N. W. Rep. 937.

Counsel for appellant concede that the will should not be set aside merely because it is unreasonable and unjust, but contend that the unjust provisions of the will giving his netire estate to his wife, leaving nothing for his married daughter by a former wife, is a strong circumstance to be considered in determining the question of testamentary capacity and undue influence. While the apparent injustice of a will may be considered in determining the testamentary capacity of the testator and whether he was unduly influenced in making the will, yet a person of sound mind has a legal right to exclude his only child from benefits under his will and the facts and circumstances in evidence do not show that the testator, in this case an adult business man, was not competent to exercise, and did not freely exercise, his legal right under the statute to dispose of his property by will.

No question of homestead rights are presented.

Undue influence comprehends over-persuasion, coercion or force that destroys or hampers the free agency and will power of the testator. Mere affection or attachment or a desire to gratify the wishes of one beloved, respected and trusted may not of itself amount to undue influence affecting the testamentary capacity of a testator. Ordinarily a presumption of undue and improper influence does not arise from the mere existence of interest or opportunity to exert such influence. Undue influence must be proven when it appears that the testator was "of sound mind."

The testimony of Mr. W. F. Himes, corroborated by others, is sufficient to overcome the testimony and con-

clusions that the testator "was not capable of making a will;" and there is no sufficient evidence to show that the testator was not "of sound mind" when he executed his will, or that he was unduly influenced in making the will. See Slaughter v. Heath, 127 Ga. 747, 57 S. E. 69, 27 L. R. A. (N. S.) and extensive notes.

The decree of the Circuit Court reversing the decree of the County Judge is affirmed.

TAYLOR AND WEST, JJ., concur.

BROWNE, C. J., AND ELLIS, J., dissent.