SHANNON, Chief Judge.
Upon petition of The First National Bank of Clearwater, an order was entered by the county judge admitting to probate a document purporting to be the will of Mrs. Wilma Lucille Witt, Deceased. The will was executed on November 24, 1959, and the bank was named therein as executor of Mrs. Witt’s estate. Subsequently, on January 1, 1960, Mrs. Witt died, leaving as her only surviving heir at law, Phillips B. deMandel, her brother, the appellant herein, who petitioned the probate court to revoke probate of the will on the ground of testamentary incapacity.
Mrs. Witt’s will, which consisted of one page, contained the following article:
“ARTICLE I.
“I do hereby devise and bequeath unto The West Coast Hospital Association, owners and operators of The Morton F. Plant Hospital, of Clear-water, Pinellas County, Florida, in fee simple, all of the property of every kind *905 and character, whether real, personal or mixed, owned or possessed by me at the time of my death.”
Trial was held before the county judge, after which he entered an order denying the petition to revoke probate, declaring the will valid and confirming its admission to probate. It is from this order that the petitioner, Phillips B. deMandel, appeals.
The only issue presented to us on this appeal is whether or not Wilma Lucille Witt was possessed of testamentary capacity at the time she executed the will in question. In support of his argument that she was not, the appellant sets forth the following six points-on-appeal:
1. Is the will involved an unnatural will ?
2. Is the burden of proof in this case upon the petitioner to show absence of testamentary capacity or upon respondent to show affirmatively the presence of testamentary capacity ?
3. In order to be possessed of testamentary capacity to dispose of an estate exceeding $2,400,000.00, need a testatrix only understand in a “general way” what she is disposing of and the effect upon her loved ones of the will she executes?
4. May the trial judge disregard scientific testimony as to the effect of narcotics on the testatrix’ mind by holding merely that the testimony of the petitioner’s pharmacologists was “nullified” by the testimony of respondent’s pharmacologists without explanation ?
5. Did the trial judge ignore the cumulative effect of the mental and physical condition of testatrix as well as the effect upon her mental competence by the medication and narcotics that she had taken ?
6. Did the trial judge misapprehend and misinterpret the effect of the evidence as a whole ?
The appellee states the questions as follows:
1. Is there substantial evidence in the record supporting the findings of the probate judge?
2. Did the probate judge misapprehend the legal effect of the evidence in its entirety ?
At the outset, we shall dispose of the matter of the burden of overthrowing a will because of testamentary incapacity. It has been held by the appellate courts of this state that this burden is a heavy one and must be sustained by a preponderance of the evidence. In re Bailey’s Estate, Fla.App.1960, 122 So.2d 243; In re Kiggin’s Estate, Fla.1953, 67 So.2d 915. This burden lies with the will contestant in such cases as the instant one. Myers v. Pleasant, 1935, 118 Fla. 715, 160 So. 204. This was the ruling made below and we perceive no error in that respect.
As grounds for the assertion that the deceased lacked sufficient testamentary capacity, the petition for revocation of probate stated, in part:
“(a) Sometime in August, 1959, Deceased developed a painful sore under her tongue and on or about October 7, 1959, approximately six weeks before her execution of said alleged will, after her persistent refusals to accept medical analysis and advice, she was informed by one of her physicians that there could no longer be any doubt that said sore in fact was an incurable cancer and that she must either accept treatment or she was doomed to die a horrible and painful death. Refusing treatment for fear that her tongue would be cut out and she would become a 'gibbering idiot’, the apprehension and terror of this dreaded death which was created in the mind of said said [sic] Deceased grew steadily greater, as did the constant and ever-increasing pain caused by the deadly cancer spreading under her tongue and into her throat, until at the time of her execution of said alleged will, such appre *906 hension and terror so affected her mind that they became the chief if not the only thoughts in said Deceased’s mind.
“(b) Said Deceased in fact did suffer constant and ever-increasing pain for a period of at least several months prior to her execution of said alleged will, and such pain became so great that Deceased became unable even to eat normally and her mind became so confused that her mental powers and faculties were all but destroyed by the time she executed said alleged will.
“(c) For a period of at least two months perior [sic] to her execution of said alleged will, Deceased was administered narcotics and other drugs in such quantities and with such frequency, and herself took in such quantities and with such frequency, that her mental powers of reasoning and memory were severely debilitated, if not destroyed entirely.”
In his twenty-nine page opinion, the county judge briefed the testimony of many witnesses and gave his reasons for finding in favor of the proponent. We quote a small portion of his opinion herewith:
“Mrs. Witt was the chief beneficiary of the large estate of her said husband, receiving almost one-half of it, and she was the recipient under the will of her mother, Mrs. deMandel, of all of the estate of her said mother, whose property was almost entirely given to her by the will of Eli Witt. The appraised value in this Court of the estate of Wilma Lucille Witt was $2,400,853.29.
“Eli Witt’s daughter, Ida, was also given a large part of his estate.
* * * * * *
“Many days of continuous sessions in July and August, 1960, were consumed in the taking of testimony of witnesses. Forty-six witnesses, in addition to deponents who did not testify in open .court, were heard. The report of the testimony of witnesses appearing in court contains two thousand three hundred and fifteen pages. Eighty-eight exhibits, some of them containing many items, were filed, about half of that number for each party. The briefs of law and fact filed on behalf of the petitioner embrace 231 pages in addition to the appendix, and the brief of counsel for the respondent contains 178 pages in addition to an appendix.
* * * * * *
“Among the witnesses were some eminent scientists and physicians, several of them nationally famous in their specialized fields. Never before in this Court, and seldom in any court, has a more distinguished array of expert witnesses — specialists in narcotics, psychiatry, and internal and diagnostic medicine — come to the witness chair. Especially notable and nationally famous were the four pharmacologists who appeared as witnesses for the respective parties concerning the use of drugs by the decedent and its effect on her central nervous system and mind. Little less distinguished and no less able were the four psychiatrists who also testified in the case.
“The trial of this case was a court'room drama of the highest order — one producing stimulating interest and compelling attention. Of the many trials in which I have participated as lawyer or as judge, none has surpassed this case in sheer dramatic interest or in the dialetic quality of legal advocacy.
iff * * * * *
“There is some evidence in the record of this case that speaks powerfully in support of the will, more powerfully even than the testimony of any of the doctors or the lawyer to who Mrs. Witt gave directions for it — Mrs. Witt’s own writings. It is as if she returned from the grave to defend her will.
******
*907 “All of these checks and stub entries are in the same firm, hold handwriting as those in 1958 and earlier in 1959. Respondent’s exhibit No. 27. This is a paper dated ‘Fri. Dec. 5 ’59’ containing a column of figures. It was found among Mrs. Witt’s personal effects after her death by Mr. Schoonmaker, a representative of the executor. It is obviously in Mrs. Witt’s handwriting., Mr. Schoonmaker testified (p. 1647 et seq. tr.) that the table contained an accurate list of stocks she owned that appear in the Tribune of that date, and that it was an accurate computation. Mr. Schoonmaker went through the list as is reported on successive pages of the record. Using the table of values in the Tribune and multiplying the value of each stock therein published, Mrs. Witt computed the value of the stocks she owned. Some of the stock was listed on the New York Stock Exchange and some was in the ‘over-the-counter’ list, both carried in the Tribune, and the computations were made from the published lists in the Tribune of Dec. 5, 1959. This was a remarkable exhibition of mental powers. It was not the work of a metastasized brain, not the act of an unbalanced mind, nor even of an affrighted mind; it certainly was not the act of the mind of a child aged three to five. Respondent’s exhibits 30 and 21 are composition books found among Mrs. Witt’s personal effects after her death. Exhibit 30 contains a list of securities by shares held by Mrs. Witt in 1959 with 12 columns showing dividends according to the month in which payable. Exhibit 31 contains a table of securities held by Mrs. Witt in 1959 listed by value. These lists of investments and income contain information down to December, 1959. There is a list for stocks and a separate list for bonds. They correctly show listings of stocks and bonds and receipts of interest and dividends except for two omissions in November, 1959 —, one income from G bonds due Nov. 1, 1959, and the other stock dividend payable Dec. 5, 1959. But these omissions in the table in exhibit 30 were corrected in table in exhibit 31. And they appear to be in Mrs, Witt’s distinctive handwriting.”
The first draft of the Last Will and Testament of Wilma Lucille Witt was prepared on November 21, 1959, and delivered to her that day. In this draft, after having devised and bequeathed everything she owned to The West Coast Hospital Association, owners and operators of The Morton F. Plant Hospital, Clearwater, Mrs. Witt had employed this language:
“ * * * I should like for some designation to be made that such facilities were made available by me as a memorial for my husband, Eli B. Witt.
“During my lifetime I have from time to time provided financial assistance to various members of my family, and I feel that through such efforts I have discharged whatever obligations I have felt I might have had to aid their welfare, and have purposely omitted them from this Will.”
According to the testimony of her attorney, Mrs. Witt telephoned him on November 23, after having gone over the first draft of her will. He testified:
“ * * * She also referred briefly to this draft to this extent: She said— and, of course, I am not quoting directly, but this is the sense of her statement — now, she said: ‘All of these other things which are in this will, for example, concerning my husband — is-there any legal necessity for that, or does that have to be in the will?’ I said, ‘No, they don’t. They serve no1 useful legal purpose. That was just my understanding of what you might like in the terms of your conversation with me.’ She said, ‘Well, if they don’t have to be in there, let’s take them out, and I would prefer to follow entirely, so far as it can be followed, the pre *908 vious Will which I gave you/ which would merely dispose of the property and appoint the executor and stop right there.”
It is apparent from the record that Mrs. Witt had never been a patient of The Morton F. Plant Hospital, nor did she know very much about it. However, one of her closest friends, Dr. Grace Whitford Parr, had been connected with the hospital for over thirty years. Dr. Parr testified as follows regarding certain telephone conversations between herself and Mrs. Witt during the period immediately preceding the execution of the will in question:
"Q. Do you recall the first conversation in which she mentioned to you the Morton F. Plant Hospital ?
“A. Yes.
“Q. When was that conversation?
“A. That was the 20th of November.
"Q. November 20th ?
“A. Yes, I remember that day very well.
“Q. Will you tell us please just what was said by her and you in this conversation ?
“A. She said, ‘I am getting my affairs in order and I am going to leave something to the Morton F. Plant Hospital.’ I said, ‘Billie, I think that is wonderful.’ I really felt that it was a compliment. I said, T think it is very nice.’ She didn’t say the amount or anything. Of course, I never thought of a large sum, myself.
“Q. You said you felt it was a compliment—
“A. (interrupting) To me.
“Q. To you?
“A. Yes, because that was the kind of work I was interested in doing. I think it was a compliment.'»
* * * * * *
MQ. Did she have other telephone conversations with you in regard to the hospital and in regard to her will ?
“A. Yes. She called me the next day and she had seen her lawyer and she said he said she would have to have somebody administrate that bequest and she said, ‘an individual, or a bank, or something of that sort? Whom would suggest?’ Well, I said, ‘I have very little to leave anybody so my lawyer will take care of what I have, but I think, if it is a large sum of money or anything very important, I would have a bank.’ Then I suggested to her my bank, the First National Bank of Clearwater and Mr. Bayly who was then the President, since retired, and has been on the Board of the Morton F. Plant Hospital for years in different capacities, and the Trust Department is considered very fine.
* * * * * *
“Q. Can you tell us, Dr. Parr, whether or not in these telephone conversations, right through the last one (November 22, 1959) you have related to us, Mrs. Witt was lucid and coherent in her conversations ?
“A. Very, and a strong vibrant voice.
“Q. Did she sound to you the same as she has throughout the years and decades you have known her ?
“A. Yes.
* * * * * *
“Q. Will you tell us, please, ma’am, what her mental condition seemed to be in your conversations ?
“A. It seemed to be perfectly normal, perfectly. She was thoroughly at herself when she talked to me.”
The witness, Eskridge, testified that in 1957, the deceased and he had several conversations concerning her estate and Mrs. Witt’s dispositive intentions in regard thereto. Eskridge further testified that in *909 each of these conversations Mrs. Witt stated that she expected to leave everything she had to charity.
Testimony relative to the question of the omission of the appellant from the provisions of Mrs. Witt’s will was also given by Eskridge, as well as by Mrs. Witt’s attorneys. Additionally, the diaries kept by Mrs. Witt, which are a part of the record herein, are helpful on this question. The entries in her 19S9 diary from November 1 to December 19, 1959, are very illuminating in regard to her mental competence.
The case most strongly relied upon by the appellant is Newman v. Smith, 1919, 77 Fla. 633, 82 So. 236, wherein Justice Browne, who wrote the opinion for the majority of the court, on rehearing, stated:
“ * * * byj where, as in the instant case, it does violence to the natural instincts of the heart, to the dictates of fatherly affection, to natural justice, to solemn promises, to moral duty, such unexplained inequality and unreasonableness is entitled to great influence in considering the question of testamentary capacity and undue influence.
* ifc * ifc *
“ ‘Besides, the will itself is unreasonable on its face, when taken in connection with the amount of his property and the situation of his relatives; and this is always proper evidence to be taken into consideration in judging of the state of the testator’s mind.’ Chancellor Walworth in Clark v. Fisher, 1 Paige (N.Y.) 171, 19 Am.Dec. 402.”
The court in the Newman case was divided three-two and it reversed the judgment of the circuit court with directions to affirm the judgment of the county judge’s court revoking the probate of the will there under consideration. The facts and circumstances of the Newman case, however, are quite dissimilar to those involved in the instant appeal. This may also be said of In re Zimmerman’s Estate, Fla. 1956, 84 So.2d 560, in which a will had been denied probate by the county judge on the ground that the testator lacked testamentary capacity. On appeal to the circuit court, the order of the county judge was affirmed and the proponents then appealed to the supreme court. In reiterating the rule governing appellate disposition of these cases, the court, speaking through Mr. Justice Thornal, stated:
“The probate judge heard all of the witnesses, except those who testified by deposition, and, as we have observed in similar cases, he was in a much better position than we are to evaluate the effect of their testimony, and fit into the complex puzzle that confronted him the various pieces that went to make up the entire picture. Many of the witnesses he apparently knew personally or by reputation; he had an opportunity to view their reactions and the directness or apparent lack of sincerity of particular witnesses in giving their replies to questions. Through his direct contact with the case he was in a position to carry in his own mind the continuity of events as they unfolded before him on the witness stand. In fact, this record in our judgment clearly justifies the application of the rule which we have consistently followed that we will not interfere with the findings of fact or the conclusions of law reached by the probate judge on the basis of such factual findings unless there is an absence of substantial competent evidence to support the findings or the trial court misapprehends the legal effect of the evidence as a whole.”
In the case of In re Bailey’s Estate, Fla.App.1960, 122 So.2d 243, a will was sought to be overthrown on the grounds of lack of testamentary capacity and undue influence, the former being predicated on the fact that the eighty-four year old testatrix had been taking narcotics for a number of years prior to her death because of illness. In that case we said:
“Whether one has testamentary capacity is a question determinable only by mental capacity of the testator at *910 the time he executed his will. The making of a will does not depend upon a sound body but upon a sound mind. The term, ‘sound mind’, means the ability of the testator 'to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator’s relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed.’ In re Wilmott’s Estate, Fla.1953, 66 So.2d 465, 467, 40 A.L.R.2d 1399; Newman v. Smith, 1919, 77 Fla. 633, 82 So. 236, 241; Hamilton v. Morgan, 1927, 93 Fla. 311, 112 So. 80; and Neal v. Harrington, 1947, 159 Fla. 381, 31 So.2d 391.”
A great deal of emphasis was placed on the fact that the testatrix in the Bailey case had used drugs, but we stated :
“The appellants place great stress upon the use of drugs such as phenobarbital, thorazine, and others by the deceased over a period of time, together with her age and illness, as having impaired her mental capacity to the extent that she lacked the ability to understand the nature and extent of her property, the proper objects of her bounty, and the nature of her testamentary disposition.
“That one may be a user of narcotics does not necessarily deprive him of testamentary capacity. In re Wil-mott’s Estate, supra. As was said in that case, at page 468 of 66 So.2d:
“ ‘He may be an addict and yet have the capacity which the law requires for making a will, if, in spite of the use of narcotics, he has sufficient mind and memory to understand the nature and extent of his property, the proper objects of his bounty and the nature of his testamentary act. Indeed, it is possible that a testator may have testamentary capacity even though it is proven that he was somewhat under the influence of drugs at the time he executes a will. The same is true where the ravages of disease combine with the effects of drugs.’
“See also Fernstrom v. Taylor, 1933, 107 Fla. 490, 145 So. 208.”
Prior to In re Bailey’s Estate, supra, this court decided the case of Heasley v. Evans, Fla.App.1958, 104 So.2d 854, wherein Judge Kanner, for the court, said:
“The important factor involved in the ability to make and execute a will is that the mind of the testator be sound enough for him to recognize and comprehend what disposition he is making of his property at the time of the executing of the instrument; that is, that he be able to understand generally the nature and extent of his possessions to be devised or bequeathed, his relations to the persons who were or should or might have been objects of his bounty, as well as a general understanding of the practical effect of the will as executed. Mere old age, physical frailty or sickness, failing memory, or vacillating judgment are not inconsistent with testamentary capacity if the testator possessed the testamentary prerequisites, particularly where the will appears * * * not unnatural in the disposition of the property. * * * ”
See also In re Estate of Reid, Fla.App.1962, Third District Court of Appeal, 138 So.2d 342; In re Wilmott’s Estate, Fla.1953, 66 So.2d 465, and 34 Fla.Jur., Wills, Sec. 23.
The appellant in the instant case has failed to point out, and our careful examination of the entire record has failed to disclose, wherein the county judge misapprehended the legal effect of the evidence as a whole and there is substantial competent evidence to support each of his findings.
Affirmed.
ALLEN and SMITH, JJ., concur.