ROSA CHAPPELLE MCGILL AND HER HUSBAND S. D. MC-
GILL, *Appellants,* v. LEWIS W. CHAPPELLE AND DA-
MON G. YERKES AS ADMINISTRATOR *ad litem* OF THE
ESTATE OF JAMES E. CHAPPELLE, DECEASED, *Appel-
lees.*

Opinion filed April 11, 1916.

Rehearing denied May 31, 1916.

1.  Where a resulting trust is sought to be established by parol
    evidence, the burden rests upon the person asserting the ex-
    istence of the trust to remove every reasonable doubt as
    to its existence by clear, strong and unequivocal evidence.

2.  The finding of a Chancellor on the testimony taken before
    an examiner will not be given the same effect as the ver-
    dict of a jury because not based upon testimony of wit-
    nesses sworn and testifying before him, and if the evidence
    so taken before the examiner clearly shows that the con-
    clusions of the Chancellor were incorrect, his conclusions
    will be reversed.

Appeal from Circuit Court, Duval County; D. A.
Simmons, Judge.

Decrees reversed.

*Cockrell & Cockrell,* for Appellants;

*Jno. W. Dodge* and *J. W. Holland,* for Appellees.

ELLIS, J.—On the 12th day of January, 1912, Lewis W. Chappelle and James E. Chappelle exhibited their bill in equity in the Circuit Court for Duval County against Rosa Brooks Chappelle in which it was alleged in substance that the orators were brothers of Pat Chappelle who died intestate in Jacksonville, Florida, on the 21st day of October, 1911, leaving surviving him his widow, Rosa Brooks Chappelle, and no children; that the father and mother of orators and Pat Chappelle were named Lewis Chappelle and Annie Chappelle; that the father died about five years and the mother died about three years before the filing of the bill; that the said Lewis and Annie Chappelle were the parents of the orators, Pat Chappelle and their two sisters Hattie Chappelle Jackson and Annie Chappelle, who were the sole heirs of their deceased parents Lewis and Annie Chappelle; that Pat Chappelle and orators Lewis W. and James E. Chappelle in the year 1900 entered into a copartnership for conducting a saloon and theatrical business; that by the terms of the co-partnership Pat Chappelle was to receive two-thirds of the net profits of the business and the orators were to receive jointly one-third; that pursuant to this agreement of co-partnership a saloon was opened in Tampa, Florida, and a theatre known as the Buckingham Theatre was located adjacent to the saloon and was operated as a theatre and opera house; that the expenses of both businesses were paid out of one common fund which was made up out of the receipts of both businesses; that for several months the partners gave their personal attention to the two busi-

nesses; that in a short while Pat Chappelle on behalf of the partnership started a troupe of colored actors on the road presenting various theatrical performances, but principally two performances known as the "Funny Folks" and "Rabbit's Foot;" that Pat Chappelle managed the theatrical business of the partnership while on the road and the orators remained in charge of the local business in Tampa, namely, the "Saloon and the Buckingham Theatre;" that the theatrical business often met with reverses and became in need of funds for transporting the outfit from town to town, which funds were furnished by the partnership derived from the saloon business in Tampa; that in 1902 James E. Chappelle began to travel with Pat Chappelle in the theatrical troupe and Lewis continued the saloon business in Tampa, until 1904 when this part of the partnership business was by agreement closed," and in 1905 Lewis Chappelle joined the theatrical troupe and continued on the road with his brothers Pat and James Chappelle "all the seasons thereafter that the partnership kept this theatrical troupe on the road, until to-wit, 1910." The bill also alleges that the copartnership was never dissolved during all these years and was financially successful; that Pat Chappelle invested the profits of the business, which were partnership funds, in the real and personal property described in the bill; that there was never any division of the profits among the alleged partners and that Pat Chappelle applied all the funds arising from the business over its expenses to his personal extravagances and the purchase of real and personal property the title to which he took in his own name. The following is the description of the real and personal property which it is alleged was purchased with partnership funds by Pat Chappelle, and which it is alleged belongs to the said co-partnership;

first, Lot 1 and east 16 feet of Lot 2, Block 22 division E LaVilla; second, Lot 4 of Block 6 Burbridge Addition to LaVilla; third, Lots 21 and 22 Block 106 Hulls Subdivision Hart's map of LaVilla; fourth, Lot 12 L'Engle's Subdivision of Lots 182 and 187 Wilder's Subdivision; fifth, East half of Lot 1, Block 35 division "E" of LaVilla; sixth, Lot 3 of Block 5 of Harris, L'Engle and Brady's subdivision; seventh, Southerly 70 feet of Lot 29 of Block 5 Burbridge's Addition to LaVilla; eighth, North 70 feet of West 30 feet of Lot 363 of DeCottes Subdivision of Hansontown; ninth, East 42 feet of the West 84 feet of Lot 4, Block 23 division "E" LaVilla, and, tenth, West 43 feet of Lot 4 Block 15 McIntosh's Addition to LaVilla. All the above described property being within the corporate limits of the City of Jacksonville; the personal property is alleged to consist of one Pullman Car named "Wyevale," one named "Rosa" and all theatrical paraphernalia now stored in a barn located on the East 42 feet of the West 84 feet of Lot 4, Block 23 division E. LaVilla, known as 1054 West Church Street. The bill also alleges that Pat Chappelle lived extravagantly, used large amounts of money in travel and other luxuries expended for his personal wants and desires, that he purchased various articles now claimed as part of his personal estate and paid out of said funds the premiums upon the life insurance policies held by him upon his own life which policies amounting to ten thousand dollars have been collected by the defendant. It is also alleged that the title to the properties described under numbers 7, 8, 9 and 10 was taken in the name of Pat Chappelle as trustee for his mother Annie Chappelle and by various conveyances in fraud of the rights of his mother and brother the title was transferred from the mother to Pat Chappelle individually; that much of the

property was improved at the time of its purchase, and much has been improved since by the erection of buildings under the supervision of Pat Chappelle and his brothers; that Pat Chappelle collected the rents from the property and has never accounted to the orators for their portion. It is also alleged that the family relations existing between the orators, Pat Chappelle, their parents and sisters were very close and intimate, that the orators relying upon Pat Chappelle as their elder brother and custodian of the partnership funds believed that he was preparing for their future welfare in the handling of the funds of the alleged partnership did not press during Pat Chappelle's lifetime their demand for a division of the property; that Pat Chappelle imposed upon his mother's confidence in him and by reason of her age and infirmities induced her to transfer to him the title to the properties described under numbers 7, 8, 9 and 10 the purchase money of which was paid out of the partnership funds.

The orators claimed that by reason of the facts alleged they were tenants in common with Pat Chappelle of the real estate described to the extent of a one-third undivided interest in the same, and that as surviving partners are entitled to the possession of the personal property belonging to the partnership; that the weekly rental from the real estate averages one hundred and forty dollars; that the defendant receives it and expends it extravagantly for her personal use; that she refuses to account to the orators therefor; that she is insolvent, inexperienced in business matters and will permit the property to deteriorate and go to waste. The bill prays that the title and interest of the orators be declared in the real estate, and that they be given the possession of all the personal property described as surviving partners, that an accounting be taken between the orators and defendants as

to the matters alleged, that she be decreed to hold the real estate in trust for the orators and herself, that the interests of the orators under the partnership be declared, and for a partition of the real estate and dissolution of the trust, and for a receiver to take charge of the property and rentals therefrom, for an injunction against the defendant from disposing of or transferring any of the property, for the appointment of a Special Master to take the testimony and for general relief.

The defendant answered the bill denying all the material allegations which it contained from which it was alleged the trusts resulted and admitted that as sole heir of Pat Chappelle she had the title to and possession of all the real property of her deceased husband. The answer admitted that the complainants and Pat Chappelle were brothers; that their father Lewis died in February, 1905, and their mother died in February, 1910; that the mother left surviving her three sons, Pat, Lewis and James Chappelle, and two daughters Annie and Hattie, but the latter called Hattie Chappelle Jackson was not the daughter of the decedent Lewis Chappelle. The answer denies the terms and provisions of the co-partnership alleged to have been formed between the complainants and Pat Chappelle in Tampa during the year 1900, and denies that the traveling theatrical troupe or troupes taken out by Pat Chappelle upon the road and performing at different places throughout the country under the names of the "Funny Folks Comedy Company" and "A Rabbit's Foot Comedy Company" were managed and conducted by him in behalf of the alleged co-partnership, but averred that such enterprise was the separate and individual property and undertaking of Pat Chappelle solely and in nowise carried on or conducted by him as part of the alleged "Saloon and Buckingham Theatre" partnership and busi-

ness at Tampa. That the connection of the complainants with the said traveling troupes was in the capacity of employees of Pat Chappelle on a salary basis for which services rendered by them they were paid in full; that they never owned any interest whatsoever in said business nor did they ever exercise or claim any right as partners therein, nor did they ever have such right. That the alleged partnership in Tampa effected in 1900 and conducted under the name of Chappelle Brothers was dissolved and ceased to exist when the business became a failure and was abandoned. That the complainants never asserted nor claimed any interest in the show business of Pat Chappelle during his lifetime, nor demanded of him any share in the profits thereof, but that such claim was asserted for the first time after his death. The answer denies the investment by Pat Chappelle of any partnership funds in the property real or personal described in the bill, avers that the money so invested by him was his exclusive property, that all the property real and personal mentioned or referred to in the bill was his sole property and was his at the time of his death and the premiums paid by him for the life insurance mentioned were paid from funds of his own in which the complainant had no interest of any character whatsoever. That all improvements placed upon the property were placed there with funds that belonged exclusively to Pat Chappelle and complainants have no interest in the same nor in the income therefrom, that although the title to some of the property described in the bill was taken by Pat Chappelle in his name as Trustee for his mother she did not contribute any of the funds towards such purchase, nor did any consideration therefor come from her, but the purchase price therefor was paid by him from his own funds and the conveyances back to him from his

mother were not fraudulent. That even if there was a partnership existing between complainants and Pat Chappelle at Tampa or elsewhere in 1900, or since then, the complainants by their laches and by the lapse of time and by their conduct have long since estopped themselves from making any just claim in their behalf such as a court of equity after the death of Pat Chappelle could entertain.

A replication to the answer was filed and a Special Master was appointed to take the evidence.

After the pleadings were filed Rosa Brooks Chappelle married S. D. McGill and by order of the court upon consent of the parties the cause proceeded in all respects as if S. D. McGill was duly impleaded therein and the pleadings and proceedings amended to the end that the court should have jurisdiction of the person of the said McGill as well as of his wife Rosa. Between the time when the taking of testimony was closed and the hearing James E. Chappelle, one of the complainants, died leaving surviving him a widow but no children, and Damon G. Yerkes was appointed administrator ad litem of the estate of James E. Chappelle by order of the court and the cause proceeded in the name of Lewis W. Chappelle and Damon G. Yerkes as Administrator *ad litem* of the estate of James E. Chappelle, deceased, against Rosa Chappelle McGill, formerly Rosa Brooks Chappelle, and her husband, S. D. McGill.

On the 31st day of December, 1914, the Chancellor made an order which was duly entered finding the equities to be with the complainants and that they were entitled to the relief prayed in the bill of complaint, and that a decree in conformity with such finding would be signed when prepared and presented by counsel.

On the 10th day of February, 1915, a final decree

was signed by the Chancellor and duly entered adjudging the equities to be with the complainants and that they were entitled to the relief prayed; that a co-partnership between Pat Chappelle and Lewis W. and James E. Chappelle was established in 1900 in which Pat Chappelle owned a two-thirds interest, and L. N. and James E. Chappelle owned jointly a one-third interest for the purpose of engaging in the saloon, theatrical and other business, which partnership was not dissolved and was in existence at the time of the death of Pat Chappelle; that the profits of such partnership were invested in various items of personal property and real estate, and that the partner or other person in whose name the title thereto was taken or other person holding under and through such holder whether as heir or successor held such property subject to a resulting trust in favor of the individual parties in their respective rights as partners; that the complainants were jointly entitled to a one-third undivided interest in all the real and personal property of which Pat Chappelle, deceased, died seized and possessed, which was purchased with partnership funds derived from the saloon, theatrical or other business as set out in the bill; that complainants were entitled to an accounting for one-third of the income therefrom, both as against the defendant as. heir of Pat Chappelle and personally as having received the income therefrom since the death of Pat Chappelle; that all the property real and personal purchased by Pat Chappelle individually or as trustee, and of which he died seized and which was purchased since the formation of the said partnership in the year 1900, and particularly the property described in the bill which was purchased with partnership funds, and that at the time of Pat Chappelle's death he held the same as trustee for himself and complainants and the defendant

holds the property as trustee for herself to the extent of two-thirds undivided interest and as trustee for the complainants to the extent of a one-third undivided interest, subject to the defendant's showing upon an accounting whether any of the funds which went into the purchase or improvement of the properties of which Pat Chappelle died siezed arose from any other source than the theatrical, saloon and other business, as set forth in the bill, in which theatrical, saloon and other business the court decreed the complainants to have been interested as partners. A receiver was appointed to collect the rents and account for the same upon the order of the court, and a Special Master was appointed to take and state an account between the complainants and defendant and the parties for a better discovery of the matters and dealings between the complainants and defendant were ordered to produce before and leave with the Master all books, papers and writings in their custody or control relating thereto, and the Master was ordered to report to the court what partnership real estate and personality of which the said Pat Chappelle died seized, what income therefrom he used in the purchase of other property, what disposition has been made of such income since his death, what partnership property the defendant has disposed of since the death of Pat Chappelle, what the expense of the upkeep of the property has been and what liens or incumbrances exist upon the property.

From this decree the defendant Rosa Chappelle Mc-Gill appealed to this court on the 16th day of February, 1915.

The appeal was dismissed upon motion of the appellant, and on the 19th day of April, 1915, the Chancellor made a final decree which was duly entered, setting aside the decree of February 10, 1915, because of a clerical er-

ror in not correctly naming the parties and setting forth the conclusions of the court as hereinbefore substantially stated with reference to the parties then before the court.

On the same day the defendants Rosa Chappelle Mc-Gill and S. D. McGill entered their appeal to this court from the decrees rendered on the 10th day of February, 1915, and on the 19th day of April, 1915, and assigned as error the making and entry of said decrees.

A voluminous amount of evidence was taken in this case and reported to the court in the effort on the part of the complainants to establish the resulting trust shown by the bill of complaint, and on the part of the defendants to refute the allegations of fact from which it was alleged the trust arose.

The existence of the alleged trust depends upon the question whether the Chappelle Brothers formed a co-partnership in Tampa during the year 1900 for the purpose of engaging in the saloon, theatrical and other businesses, whether such co-partnership contemplated the business of conducting and operating a traveling comedy or other theatrical entertainment, and whether the purpose of the co-partnership if such was its purpose, was abandoned and the co-partnership dissolved before the properties described in the bill were acquired or whether any funds of the co-partnership of 1900 were invested in such properties.

The evidence shows that the Chappelle Brothers did form a co-partnership in Tampa, Florida, about October, 1900, for the purpose of conducting a whiskey saloon in a building located in Fort Brook, which was rented from one Robert Mugge at a rental of forty-three dollars and thirty-three cents per month, and that in connection with the whiskey business they conducted under the same roof in an adjoining room connected with the saloon by

an open doorway, a dance hall and theatrical entertainments.

Prior to this time Pat Chappelle had been engaged in selling whiskey in the City of Jacksonville in connection with which he operated a negro vaudeville show, or dance hall until about the first of the year 1899 when he moved to Tampa and formed a co-partnership with one Pierce Hamilton in the saloon business, which co-partnership lasted for several months. While engaged in business in Jacksonville Pat Chappelle became involved in a dispute with his landlord as to the amount of the former's indebtedness for rent, which dispute was not settled for many years, if at all. This circumstance is mentioned here because Pat Chappelle in later years referred to this fact as a reason why the title to some of his property was taken in his name as trustee for Annie Chappelle, in order as he thought to make it difficult for his creditor to reach this property in the event judgment should be obtained against him. The co-partnership between Pat Chappelle and Pierce Hamilton coming to an end, Chappelle formed another co-partnership with one R. S. Donaldson. These two obtained a lease upon the same property from Robert Mugge on September 30th, 1899, which Chappelle Brothers later occupied upon which to conduct their business and for the same rental. In this building the co-partnership consisting of Pat Chappelle and R. S. Donaldson conducted a whiskey saloon and in the adjoining room a theatrical entertainment. This place during the existence of the co-partnership was known as the "Buckingham Theatre," the same name by which it was known when occupied later by Chappelle Brothers. During the co-partnership between Chappelle and Donaldson, Pat Chappelle carried a theatrical troupe upon the road known as the "Imperial Min-

strel" which seemed to have failed at Memphis, Tennessee, in 1899, in which neither Hamilton nor Donaldson, his partners of that year in the saloon business at Tampa appears to have been interested. During the year 1900 Pat Chappelle obtained a copyright for his musical comedy entitled "A Rabbit Foot," and thereupon organized a troupe, employed actors and musicians preparatory to exhibiting the show in different cities in the United States and Canada. He travelled with this show exhibiting in New York City, among other places, but in this traveling show business his partner in the saloon and theatre business at Tampa, R. S. Donaldson, had no interest. Pat again failed and returned to Tampa in the Fall of 1900. During this time L. W. Chappelle and James E. Chappelle were living in Tampa, one of them clerking for Chappelle and Donaldson and the other working at times for Donaldson and at other times for a man by the name of Stevens. Both, however, knew of the existence of the co-partnership of Chappelle and Donaldson, and the character of business carried on at the "Buckingham Theatre and Saloon," and of the separate and independent enterprise conducted and owned by Pat Chappelle, which came to grief on two occasions at least.

Upon the return of Pat Chappelle to Tampa he and Donaldson became involved in a dispute between themselves as to the settlement of accounts between them, which was finally settled in a lawyer's office. Chappelle was shown to be in debt to Donaldson, who moved out of the building carrying whatever of stock and fixtures there were, and Pat Chappelle and his brothers Lewis and Jim moved in. The new firm was called Chappelle Brothers, and they carried on the same business at the same stand. There is no evidence whatsoever that the new co-partnership contemplated the carrying on of any

other business than that of a whiskey saloon, dance hall and theatrical entertainment in the building known as the "Buckingham Theatre." This business was carried on until sometime during the year 1901, a small passenger car was purchased. The evidence is not at all clear as to whose funds went into the purchase of this car. Complainants, witnesses in their own behalf, say it cost three hundred dollars and was paid for in two checks for one hundred and fifty dollars each, one payable to Billy Lehr and the other to Miss Agnes Manning; both of these checks were certified, but the last one appears to have been taken back to the bank and the cash obtained by Chappelle Brothers. All the witnesses agree, however, that the money which was used to pay for the car was realized in a game at cards, in which Pat Chappelle won heavily and the evidence is not at all clear nor satisfactory that either one of the other brothers participated in the game or were financially interested except in the very small commission usually paid to the "House" in such cases, according to the witnesses. With the money thus realized from the game the small car was bought and named the "Little Annie," after the mother of these brothers, and used in the traveling show business, which seemed to be Pat Chappelle's ambition to organize and carry to success. According to one witness, who during the years from 1899 to 1901 inclusive was employed by the S. A. L. Railway at Tampa as ticket agent and Traveling Passenger Agent and who had much dealing with Pat Chappelle and Chappelle Brothers, the "Vaudeville show ran as Chappelle Brothers" while the name of the road show was "Pat Chappelle's Rabbit Foot Comedy Company." During the year 1901 Pat Chappelle in his own name made contracts with certain persons for their services in connection with the "Rabbit's Foot Comedy

Company" whose names do not appear in the "Managerial Staff" of Chappelle Brothers, nor among the list of performers, "vocalists, soubrettes" and other attaches of the "Buckingham Theatre" during the season of 1901. For a short while during that year one of the original complainants, James E. Chappelle, claimed to have traveled with Pat, his brother, and the show, but upon cross-examination he was uncertain whether it was during the year 1901 or 1903; in any case it does not appear that he was connected with the show in the capacity of part owner or in any other capacity than as employee, and growing tired of his employment he returned to Tampa and spent his time gambling, according to his testimony. It was during this year that Lewis Chappelle and not Chappelle Brothers, according to complainants' exhibits, forwarded to Pat Chappelle money for transporting the "Rabbit Foot" show from place to place. Money was sent by Lewis Chappelle for this purpose four times, and aggregated the sum of ninety-two dollars and thirty-five cents. During the year 1902 the sum of one hundred and seventy-nine dollars and twenty cents was spent as it is claimed for traveling expenses of certain actors employed by Chappelle Brothers; of this amount ninety-six and 80-100 dollars appears to have been paid by Pat Chappelle for the traveling expenses of three actors who it does not affirmatively appear were employees of Chappelle Brothers vaudeville entertainment or show at Tampa. Seventy-three dollars of the amount appears to have been paid by Chappelle Brothers for the traveling expenses of a person, who later and while under contract with Pat Chappelle individually as proprietor of the "Rabbit Foot Comedy Co." for services to be rendered the traveling show, permitted himself to be employed by a rival concern, which resulted in a suit by Pat Chappelle

individually against his rivals which was carried to a successful issue in favor of the plaintiff. This litigation was known to Lewis and James Chappelle. Pat becoming a witness in his own behalf in that case swore he was the sole owner of the "Rabbit Foot Company." His affairs he frequently discussed with his attorney at that time, in the presence of his brothers and the attorney who conducted the litigation had no intimation whatever that Lewis and James were interested in the "Rabbit Foot Company." It was contended that at this time "Chappelle Brothers" were the owners of the traveling show and their name appeared upon the car called "Little Annie" and that there were no silent co-partners in this business. It is very significant that neither the attorneys for plaintiff nor defendant discovered this fact, and that both of the alleged partners should have permitted the action to continue in the name of one as sole owner and hear him testify to that exclusive ownership without the slightest protest.

During the year 1903 Pat Chappelle continued to travel with his show from place to place, wrote letters, made contracts, entered into an agreement for the purchase of another car, rented buildings in which to exhibit his show and pushed claims against railroads for damages to his property all in his own name as sole owner, while one of the alleged co-partners was with him part of the time in the capacity of employee, while the other was conducting the "Buckingham Theatre Saloon" at Tampa and advertising on the letter heads that the theatre was open all the year. It was during this year that the "Saloon and Theatre" business at Tampa came to a disreputable close by the arrest and conviction of one of the partners for attempting to evade the law by conducting the business without first obtaining a license

therefor. The business was terminated, the doors of the "Buckingham Theatre and Saloon" were closed and the proprietor in charge sent to jail. In the meantime it does not appear that remittances had been duly made to Pat Chappelle on account of his two-thirds interest in that business. Pat Chappelle, however, went to Tampa, employed counsel, obtained the release of his brother and rejoined his troupe. Lewis Chappelle however did not go with the show at once, but went to Jacksonville where he remained for several months and did not become connected with the traveling show until the year 1904; his business relation to his brother Pat from 1905 is conclusively shown by the record to be that of employee and employer. It is shown by his letters to his brother in which he disclaims any interest in the show or its properties, by his written receipts for the weekly salaries of himself and wife, by his arrest for undertaking to sell for his own use some of the property of the show; by his effort to obtain a lease on one of the shows which was organized by Pat Chappelle in 1905 or 1906 and called the "Funny Folks," and by his disclaimer on several occasions, and once in a judicial proceeding, of any interest in the business, and an acknowledgment of Pat Chappelle's sole proprietorship. The same is true as to the complainant James E. Chappelle so far as the acknowledgment of his position with the show to be that of employee and Pat Chappelle's sole ownership of the property, real and personal, during the latter's life time is concerned. James at one time became the lessee of some part or portion of the real estate from his brother Pat and was ejected for the non-payment of rent; during his connection with the show his brother Pat frequently complained of his conduct as dishonest, and that of his brother Lewis as inefficient; Pat's complaints became so

frequent and severe as to the incompetency and dishonesty of his two brothers as employees that they quit the services of their brother and for a time abandoned the show. They knew of the investments that their brother Pat Chappelle was making in real estate in Jacksonville, his improvement of the same, the collection of rents, the title to the property being taken in himself, the advertisement of the show as "Pat Chappelle Sole Owner" and his open and avowed ownership and exclusive control of the show, its properties and the proceeds from the exhibitions, without ever making any effort to secure from their brother a division of the profits, or an accounting therefor or an acknowledgment from him of their alleged interest as partners in this enterprise for which they had so frequently shown their unfitness by reason of their incompetency and dishonesty.

The law upon the subject of the establishment of resulting trusts by parol evidence has been frequently declared by this court. "The evidence to establish such trusts must be so clear, strong and unequivocal as to remove from the mind of the Chancellor every reasonable doubt as to the existence of the trust." Geter v. Simmons, 57 Fla. 423, 49 South. Rep. 131; Johnson v. Sherehouse, 61 Fla. 647, 54 South. Rep. 892; Lofton v. Sterrett, 23 Fla. 565.

The complainants many years after the forming of the co-partnership in Tampa and the complete abandonment of the business at that place seek now after the death of their partner of twelve years before, for the first time during that period to establish their business relation to him as co-partner. When during the years of trial, when the business by carelessness, inefficiency and dishonest methods might at any time have gone to pieces and become a failure and liability, they acknowledged

their brother to be its sole owner and proprietor, accept-
ed from him good salaries for themselves and their
wives, were content to accept pay for their inefficient
service and cast upon their brother the entire responsi-
bility for financial failure to which their services so much
tended and wait until death removes him from the scenes
and prevents his denial of their statements to claim an
interest in the property, real and personal, the accumula-
tion of which was due to the energies, business acumen,
prudence, business integrity and unswerving purpose of
their brother.

The evidence convinces us that the co-partnership
formed in Tampa, Florida, between Pat Chappelle, Lewis
and James Chappelle, did not contemplate the carrying
on of any other business than that of a local whiskey
saloon and play house; that the "Rabbit Foot Comedy
Company" formed no part of the enterprise, but was the
separate, distinct and independent business and enter-
prise of Pat Chappelle and was so recognized by the com-
plainants for a period of nearly twelve years, and that
all the property real and personal described in the bill of
complaint was purchased with funds which belonged to
and were the exclusive property of Pat Chappelle in
which his brothers, the complainants, had no interest
whatsoever.

The Chancellor, however, found differently, and it is
urged that as the fact of the co-partnership in 1900 was
clearly established by the evidence and the Chancellor so
found, this court will not disturb the decree because the
burden of showing a dissolution of the co-partnership
rested upon the defendant and the evidence is not suf-
ficiently strong in that regard to clearly show that the
Chancellor erred. There is no fault to be found with
the principle, but its application to the facts of this case

is denied and we think correctly. The Chancellor's conclusions should be reversed on the finding of fact that the co-partnership of 1900 between the Chappelle Brothers contemplated the business of carrying on a traveling show in connection with the business of selling whiskey and maintaining a play house in connection with the saloon. In this we think that the Chancellor clearly erred and his conclusions should be reversed. City of Jacksonville v. Huff, 39 Fla. 8, 21 South. Rep. 774; Waterman v. Higgins, 28 Fla. 660, 10 South. Rep. 97; Perez v. Bank of Key West, 36 Fla. 467, 18 South Rep. 590.

The Chancellor's conclusions were not on a par with the verdict of a jury because they were not based upon the testimony of witnesses sworn and testifying before him. Lucas v. Wade, 43 Fla. 419, 31 South. Rep. 231. It is therefore ordered that the decrees be and the same are hereby reversed and the bill of complaint is dismissed and the costs to be taxed against the appellees.

TAYLOR, C. J. and SHACKLEFORD and WHITFIELD, JJ., concur.

COCKRELL, J., takes no part.