JUNE K. McCHESNEY and C. W. HILL v. HARRY HERMAN, *et ux.*, WEST COAST ARMY STORES, INC., FRANK B. FORNWALD, *et ux.*, SEAMAN CLAPP, *et ux.*

176 So. 565.
Opinion Filed October 23, 1937.

*Lambdin & Ramseur* and *Richard G. Key*, for Appellants; *Wilson & Bogue*, for Appellees.

CHAPMAN, J.—The parties to this suit will be referred to as they appeared in the court below, as plaintiff and defendants.

On the 26th day of September 1932, plaintiff filed in the Circuit Court of Pinellas County, Florida, a bill to foreclose a mortgage in the sum of $4,500.00 on lands situated in Pinellas County, and the note is dated July 14, 1925, and the sum fell due one year after date and was signed by Harry Herman and wife, Ray Herman. The mortgage was recorded among the public records of Pinellas County in Mortgage Book No. 194 at page 46 on the 22nd day of July, 1925.

On January 16, 1933, joint and several answers and counterclaims were filed by Harry Herman and wife, Ray Herman. The answers as filed admit the executing and delivery of the note and mortgage sued upon and that the plaintiff prior to the execution and delivery thereof intermarried with John Homer Myers and continued to cohabit with him as his said wife for a period of time after the maturity date of the note and mortgage. The marriage ceremony was annulled under date of July 27, 1929, by a

decree of the Superior Court of Bridgeport, Connecticut. John Homer Myers was indicted and pleaded guilty to the crime of bigamy in the courts of Connecticut. Plaintiff and her husband for a short period lived in Pinellas County and John Herman Myers maintained a real estate office there during the boom period. The note and mortgage sought to be foreclosed were renewed and in the renewal Herman dealt with Myers and had no personal acquaintance with the plaintiff here until after it is alleged that he paid the mortgage. The transactions were had largely at Myers' real estate office in St. Petersburg. It is alleged that the defendants on the 24th of July, 1926, paid to the husband of the plaintiff the sum of $4,690.00, the amount due as principal and interest, and accepted as evidence thereof the receipt of the husband of the plaintiff. The answers seek a dismissal of the bill and a cancellation of record of the mortgage herein. The answer asserts that John Homer Myers, or Homer J. Myers, acted as agent of June K. McChesney in and about the renewal, the acceptance of the installment interest and payment in full settlement of the note and mortgage herein. It is unnecessary to recite replications on the part of the plaintiff to the answer and counter-claim of the defendants or the supplemental answer or order of the Court on motions to strike either of them.

The Honorable T. Frank Hobson, a Judge of the Sixth Judicial Circuit of Florida, in and for Pinellas County sitting in Chancery, heard all the testimony in the cause and after argument of counsel entered a decree denying the prayer of the bill of the plaintiff and finding the equities of the cause with the defendants, and ordered a cancellation of record of the mortgage sued upon. From the final decree in behalf of the defendants an appeal was taken to this Court, where 23 assignments of error are urged why

the decree appealed from should be reversed. Each of these assignments rests upon the findings of the Court upon questions of fact as expressed in the final decree. We do not think or believe it necessary for a disposition of this cause to consider all assignments of error, but only the final decree entered by the lower court.

The note and mortgage involved here were renewed under date of July 14, 1925, for the sum of $4,500.00 due one year after date. It was an original obligation of W. H. Price and wife, Anna L. Price, and the mortgagee is the plaintiff here. The defendants bought the property and assumed the payment thereof. The interest installments were paid at the office of the plaintiff's husband at St. Petersburg. Her attorney, Donald Jackson, worked in the office of her husband and the cancellation of the Price mortgage was handled by him. The evidence shows Harry Herman had no acquaintance with the plaintiff, but knew personally and dealt with her husband, H. J. Myers. The record shows plaintiff intermarried with H. J. Myers on the 11th day of July, 1923, at Danbury, Connecticut, and obtained an annullment decree on July 27, 1929. The plaintiff and H. J. Myers were not living together as husband and wife on July 24, 1926, but they occupied the same home or the one owned by plaintiff and at the time were having differences about his wife then living at Atlanta, from whom he had not been divorced and to whom he was sending money from time to time.

The record shows that the defendants had no knowledge of the domestic storms of the plaintiffs, but they, like the general public, considered them as husband and wife living and cohabiting together, holding each other out as husband and wife. All of the business transactions about the note and mortgage here were handled at Myers' office, with the

exception of a telegram received from the plaintiff and a letter in reply sent to her in Connecticut about the payment or renewal of the note and mortgage and no further information came to defendant Herman from plaintiff. It seems from all the evidence appearing in the record that plaintiff permitted or allowed her husband, H. J. Myers, to manage and control her said business and especially is this true in dealing with the defendants here. Herman gave a check for the amount of the note and accumulated interest payable to H. J. Myers dated July 24, 1926, and accepted a receipt therefor signed by him and the check was charged at the bank to Herman's account.

It appears the relation of husband and wife existed between the plaintiff and H. J. Myers and the defendant in his course of dealing with the wife through the husband and from all the then apparent conditions and circumstances was justified in assuming that Myers was the agent of his said wife, the plaintiff here, and this Court in the case of Craft v. American Agricultural Chem. Co., 81 Fla. 55, text p. 58, 87 Sou. Rep. 41, said:

"Whatever the social relations between a husband and wife may be, so long as she permits him to occupy, manage and control her separate statutory property, he is her agent. This agency terminates only when she takes the management of her property out of his hands, and personally assumes it or appoints a new agent. And so long as she permits the husband to manage her separate property, that property will be chargeable in equity for the purchase price of goods and material purchased by him in the due course of his management, and for its benefit.

"The doctrine that, even in the absence of statute, the wife may appoint her husband as her agent to manage her separate property, seems too well settled to require a cita-

tion of authority. 25 Am. & Eng. Ency. of Law, 369. It is equally well settled that this appointment may be proved by such evidence and inferences as are requisite or admissible in proving any other agency.

"When a married woman knowingly permits her husband to manage or control her property, or allows him so to deal with it as to induce others to believe that he is acting as her authorized agent, such facts are sufficient to establish the agency in favor of persons who deal with him in such belief. 25 Am. & Eng. Ency. Law 370, and numerous cases there cited."

The laws of Florida provide for the management by the husband of the wife's property and some affirmative action on the part of the wife is necessary to revoke the authority created by statute, Section 5967 C. G. L.; 1927, viz.:

"The property of the wife shall remain in care and management of the husband, but he shall not charge for his care and management, nor shall the wife be entitled to sue her husband for the rent, hire, issues, proceeds or profits of her said property."

In the suit of Florida Citrus Exchange v. Grisham, 65 Fla. 46, text p. 49 and 50, 61 Sou. Rep. 123, the Court had before it the question of a contract of the husband over the wife's property when it was said:

"It is, however, asserted that the question is no longer open in this State. Assuming that the Court may estop itself from obeying the mandate of the Constitution, we shall proceed to examine our previous holdings. In Marye v. Root, 27 Fla. 453, 8 Sou. Rep. 636, the precise point decided was that the income from the wife's property would not be subjected or sequestered for the husband's debts, under the Constitution of 1868. Following up this decision we held in Shomaker v. Waters, 59 Fla. 414, 52 South. Rep.

586, that the husband alone could not mortgage the crops grown upon her separate property. In Fritz v. Fernandez, 45 Fla. 318, 34 South. Rep. 315, and Graham v. Tucker, 56 Fla. 307, 47 South. Rep. 563, we recognized some life in the statute to the extent that only of holding that the wife, consenting actively or· silently, the husband might be her responsible agent in the management and control of her property."

See Fidelity & Casualty Co. v. Morrison, 116 Fla. 66, 156 Sou. Rep. 385.

Counsel for plaintiffs contend that the duty rested with the defendants to make inquiry and ascertain who had the possession of the note and mortgage and likewise be diligent in learning or knowing the owner thereof prior to the time of part or full payment. While we can agree fully with this principle of law and its application to the facts here, but it does permit or allow payment to authorized agents of the owner as expressed in Scott v. Taylor, 63 Fla. 612, text p. 619, 58 Sou. Rep. 30, when the Court said:

"The duty of a maker of a negotiable note to see that the person to whom he pays it has it in his possession before making the payment is not affected by the fact that the note was on its face made payable at the office of the person to whom he makes the payment. Powers v. Woolfolk, 132 Mo. App. 354, 111 S. W. Rep. 1187; Hoffmaster v. Black, 78 Ohio St. 1, 84 N. E. Rep. 423, 21 L. R. A. (N. S.) 52; Baxter v. Little, 6 Met. (Mass.) 7; 39 Am. Dec. 707. The maker of a negotiable promissory note can satisfy it only by payment to the owner at the time of such payment, or to such owner's authorized agent. If the recipient of the money is not actually authorized, the payment is ineffectual, unless induced by unambiguous direction from the owner or justified by actual possession of the note. This

rule applies generally to all negotiable paper, independently of the existence of any mortgage or other security."

We do not think it necessary for a determination of this suit to consider the constitutional and statutory provision of law controlling the separate property of a wife or the decisions of the Court applicable thereto as cited by counsel for plaintiff.

H. J. Myers and plaintiff, as far as this defendant knew, were husband and wife and all the transactions about the note and mortgage in question were had at the Myers real estate office in the City of St. Petersburg, either with H. J. Myers or someone in his office. The defendant, as far as the record shows, had no knowledge of the strained relations between plaintiff and her husband. Some four or five days prior to payment she was requested to submit the amount due and the place of mailing the check, but she did not act and the hsuband immediately appeared when payment was made and receipt obtained. This Court has held where one of two innocent persons must suffer for the wrongful act of a third, he who gave the power to do the wrong must bear the burden of the consequences.

In the suit of Bush Grocery Co. v. Conely, 61 Fla. 131, 55 Sou. Rep. 867, this Court said:

"Where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act, and therefore deals with the agent, the principal is estopped, as against such third person, from denying the agent's authority. Holt v. Schneider, 57 Neb. 523, 77 N. W. Rep. 1086. Whether or not an act is within the scope of an agent's apparent authority is to be determined, under the foregoing

rule, as a question of fact, from all the circumstances of the transaction and the business. Where one of two inno-cent persons must suffer for the wrongful act of a third, he who gave the power to do the wrong must bear the bur-den of the consequences. People's Bank of Belleville v. Manufacturers' National Bank of Chicago, 11 Otto (U. S.) 181, 25 L. Ed. 907; American Process Co. v. Florida White Press Brick Co., 56 Fla. 116, text 121, 47 South. Rep. 942.

If one holds another out to the world and accredits him as his agent he is bound by that person's act done within the scope of the agency thus given to him. In such cases the question is, not what authority was intended to be so given the agent, but what authority was the third person dealing with him justified from the acts of the principal in *believing* was given to him.

The testimony is lengthy and it occurs that each witness appearing in the cause was closely and thoroughly examined by counsel. A number of exhibits were adduced. An order of reference was not made, but all the witnesses were before the Chancellor, who considered their credibility, de-meanor, and interest, if any, in the cause. While the evi-dence on many important points is conflicting, this Court is forced to follow the findings of the Chancellor unless shown here to be clearly erroneous. The rule is fully ex-pressed in the suit of Farrington v. Harrison, 95 Fla. 769, text p. 770, 116 Sou. Rep. 497, when it was said:

"We also bear in mind the oft reiterated rule that while the findings of the chancellor on the facts where the evi-dence is heard by him, and the witnesses are before him, are entitled to more weight in the Appellate Court than where such findings are made in a cause where the testi-mony was not taken before the chancellor, yet in either case

the chancellor's findings should not be disturbed by an Appellate Court unless shown to be clearly erroneous. Sandlin v. Hunter Co., 70 Fla. 514, 70 Sou. Rep. 553; Travis v. Travis, 81 Fla. 309, 87 Sou. Rep. 762; Lucas v. Wade, 43 Fla. 419, 31 Sou. Rep. 23. On the other hand, where a decree is manifestly against the weight of the evidence or contrary to and unsupported by the legal effect of the evidence, then it becomes the duty of the Appellate Court to reverse such decree. Carr v. Leslie, 73 Fla. 233, 74 South. Rep. 207; Florida National Bank v. Sherouse, 80 Fla. 405, 86 South. Rep. 279, Gill v. Chappelle, 71 Fla. 479, 71 South. Rep. 836; Lightsey v. Washington Park Properties, 112 South. Rep. 555."

The decree appealed from is hereby affirmed.

ELLIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.

BROWN, J., dissents.

BROWN, J. (dissenting).—Mrs. McChesney and Myers were never husband and wife. Theirs was a bigamous marriage and the Connecticut court held it void *ab initio,* which is in line with our Florida decisions. Therefore, the statutory agency of the husband for the wife did not exist. Myers had another living wife all the time. With this statutory agency of the husband excluded, I hardly think the evidence goes far enough to prove agency in fact.