**E. HERBERT KELLOGG, et al., v. M. R. PORTER and LILLIAN S. FOKES.**

20 So. (2nd) 59                                June Term, 1944
December 5, 1944                       Special Division ·A

Frank R. Greene, and James Whitehurst, for appellants.
W. Robert Smith and Scofield & Scofield, for appellees.

PER CURIAM:

Prior to February 26, 1943, M. R. Porter, E. W. Stephenson and Lillian S. Fokes owned and operated a business of mining colloidal, or waste pond phosphate, near Hernando in Citrus County, Florida, under the partnership name of M. R. Porter Company. M. R. Porter owned 70% interest in the business and was business manager, while E. W. Stephenson owned 25% and was production manager; Lillian S. Fokes owned 5% and was secretary of the business and private secretary of M. R. Porter.

The M. R. Porter Company obtained or mined colloidal or waste pond phosphate from two separate deposits shown by maps in the record as being in close proximity to each other, situated near Hernando, Florida. One was owned by the Dunnellon Phosphate Mining Company and the other by a group represented by their trustee, D. B. Kibler, Jr. The M. R. Porter Company mined the deposit of phosphate of the Dunnellon Phosphate Mining Company under a lease. The other deposit situated adjacent to or in close proximity of, and identified in the record as "Rabbit Hill" deposit, was mined and operated on a royalty basis of 20 cents per ton, evidenced by an agreement signed by the parties and a letter of confirmation signed by M. R. Porter Company directed to A. B. & B. D. Kibler, Inc., Lakeland, Florida.

Pursuant to several days negotiations and on February 26, 1943, the three parties composing the co-partnership of

M. R. Porter Company signed an instrument transferring the mining property, with additional property, to The Kellogg Company of Sycamore, Ill., and received therefor the sum of $21,399.17. The production manager, Mr. Stephenson, accepted employment with The Kellogg Company, and his duties with the latter company were about the same as with M. R. Porter Company. Phosphate was taken from the two deposits when operated by the Porter Company and after the transfer the new (Kellogg) company continued to mine phosphate from the two deposits until restrained by a court order from mining the "Rabbit Hill" deposit.

On July 31, 1943, M. R. Porter and Lillian S. Fokes filed an amended bill of complaint in the Circuit Court of Citrus County, Florida, against C. M. Stormes and E. Herbert Kellogg, a co-partnership trading as The Kellogg Company, and E. W. Stephenson, a former member of the partnership of M. R. Porter Company. The amended bill comprised several pages and prayed for an accounting for the value of the colloidal or waste land phosphate taken from the "Rabbit Hill" deposit, on the theory that the Porter Company did not sell or transfer on February 26, 1943, the "Rabbit Hill" deposit of colloidal phosphate to The Kellogg Company.

An answer was filed in which it was alleged that all the "Rabbit Hill" phosphate rights owned by the M. R. Porter Company were included in the transfer and the answering defendants placed in possession thereof and had operated or mined the "Rabbit Hill" deposit from February 26, 1943, until April 30, 1943, without objection or protest from M. R. Porter Company. That the entire course of negotiations between the parties unequivocally established the fact that the "Rabbit Hill" deposit passed to the defendant upon the delivery of the written instrument and the payment to the Porter Company of the $21,399.17 by The Kellogg Company.

The chancellor heard the testimony adduced by the respective parties and concluded therefrom that the "Rabbit Hill" deposit was not included in the trade, but that the right to mine the same rested in the M. R. Porter Company. The Kellogg Company was permanently restrained from working or mining the "Rabbit Hill" deposit and an accounting granted

for the 2476 tons of colloidal or waste pond phosphate mined therefrom at the rate of $2.20 per ton, aggregating $5,447.20, with costs, and a final decree was entered accordingly. The Kellogg Company has perfected an appeal therefrom to this Court.

The briefs of counsel disclose the questions posed here for adjudication. The tap root of the entire controversy is whether or not the "Rabbit Hill" phosphate deposit was included in the trade between the parties. If this waste pond deposit was not included in the deal, then the decree appealed from must be affirmed. If it was included, then the decree appealed from must be reversed and the amended bill of complaint dismissed. The answers to the propounded questions are found in a study and analysis of all the evidence and the many exhibits adduced by the respective parties.

The testimony discloses that the area of the two deposits, after removal of trees, brush and over burden, approximated some 10, 12 or 15 acres; the two deposits had been prepared for mining by the M. R. Porter Company prior to closing of the trade on February 26, 1943. Among the items listed as being conveyed was "cleared surface, approximately 15 acres—$1500.00." In a letter dated at Ocala, Florida, February 15, 1943, addresed to The Kellogg Company and signed by M. R. Porter Company was the language viz: "This will include an assignment of all leases which we now hold on certain phosphate lands." A letter dated March 8, 1943, signed by M. R. Porter Company and addressed to W. H. Klee, Jacksonville, Florida, contained language viz: "Because of the desperate labor situation, and many other conditions, the M. R. Porter Company sold out March 1st to The Kellogg Company . . . of Sycamore, Ill."

Shortly prior to closing the trade Mr. Porter took Mr. Kellogg from Ocala, Florida, to the mine near Hernando. The M. R. Porter Company at the time was taking colloidal phosphate from the "Rabbit Hill" deposit and from the Dunnellon Phosphate Mining Company deposit. One was located a little north of the other, but the two could be easily seen from the spot where Porter and Kellogg stood when observing the two deposits. Mr. Porter testified viz:

"Q. When you took Mr. Kellogg out there to these deposits you were mining both of them, were you not? A. Yes, sir. Q. Your machinery and men were working on both of them? A. The machinery was in the Dunnellon deposit at the time we went out there. Q. But you were mining them both as one operation, almost as one deposit? A. Yes, sir. Q. And you didn't tell Mr. Kellogg that the deposit on the right of that road was not included in the sale? A. I had only been discussing with him the Dunnellon deposit and the plant, and whether we discussed other deposits I don't think anybody knows, but I don't think we did. Q. But you never did tell him that you were reserving one of the deposits that your Company was working? A. I don't think so."

Mr. Kellogg's testimony concerning the conversation had with Mr. Porter on their visit to the Hernando mines is viz:

"Q. As I understand Mr. Porter told you that these were the deposits that they were working? A. Yes, sir. Q. Did he ever tell you that he was reserving one of those deposits from the sale? A. No, sir. Q. What was your understanding with him at that time as to what he was offering to sell you? A. (No answer before objection). By Mr. Scofield: We object to that, first, because the written contract is binding between the parties and needs no oral explanation, second, because the contract has been reduced to writing and is presumed to contain all of the conditions. Third, any statement that this witness might make would be merely a conclusion as to what the contract was. By the Court: Objection overruled. By Mr. Greene: (Continuing) Read the question, please. (Question read to the witness). A. We were to buy the plant, all equipment, all deposits and he was to keep the accounts receivable, and we bought the bags and ties in the plant to be used for it."

On February 27, 1943, E. W. Stephenson, owner of 25% interest in the M. R. Porter Company, and after joining in the instrument of conveyance of the property to The Kellogg Company, accepted employment as production manager for The Kellogg Company. He took over the two phosphate deposits and continued mining them without protest or objection from Mr. Porter or Lillian S. Fokes, until April 30, 1943.

The Kibler file in Porter's office was delivered to Kellogg, or Kellogg so testified. Porter testified that he did not give the Kibler file to Kellogg but that he missed it and Kellogg had frequent access to this file when in his (Porter's) office. Lillian S. Fokes testified as to the disappearance from the Porter office of the Kibler file about the time the trade was closed.

Mr. Stephenson's testimony on the inclusion of the "Rabbit Hill" deposit is viz:

"Q. Did Mr. Porter inform you of the sale that was being negotiated and what was involved in it? A. He did. Q. What did he tell you he was selling? A. The price was going to be $25,000.00. Q. What did he tell you he was selling? A. I understood the whole thing outside of the collections we had coming in. Q. Would they be classed as accounts receivable? A. Yes, sir. Q. What else? A. Well, the bags, of course, they were sold but were to be sold later. Q. What about the cash in banks? A. We retained that. Q. Please state what assets he told you would not be sold to Mr. Kellogg? A. None whatever. Q. Was anything else to be reserved out of the sale except the accounts receivable and cash on hand and in the bank? A. None that I ever heard of. Q. Did he ever tell you or did you hear any suggestions from anybody that the Kibler deposit was not to go with the rest of the phosphate deposits? A. No, sir. Q. Was it your understanding as a partner of the Company that the rights of the Company in the Kibler deposit, known as Rabbit Hill, were being sold to The Kellogg Company? (Objection overruled) A. It was my understanding. Q. Now, Mr. Stephenson, at the time you signed the agreement or sheet marked 'agreement,' being the first sheet of plaintiff's Exhibit No. 1, was the second sheet of that exhibit, the schedule, already executed? A. As far as I remember the second sheet was executed before I signed this one. Q. About what time of day would you say you signed the agreement, the first sheet of Exhibit No. 1? A. It was around 8 o'clock at night, I would say. Q. Did you have anything to do with the preparation of either one? A. No, sir. Q. I call your attention to this item on the schedule, 'cleared Surfaces, approx. 15 acres, $1500.00.' What did that

refer to according to your understanding of the transaction? A. Cleared surfaces,—well my idea of cleared surfaces is all you have to do is go in there and take a disk harrow and disk it up and as soon as it is dry haul it in to the shed and it is ready for action. Q. Would it be a cleared surface if it was covered with dead weeds and grass? A. Absolutely not. Q. Did you clear this surface or have it done under your supervision prior to February 26th, 1943? A. Yes sir."

It is shown that Kellogg desired an approval of the assignment by the M. R. Porter Company to The Kellogg Company of the lease from Dunnellon Phosphate Mining Company, and accordingly the necessary steps were taken to accomplish this objective. Kellogg examined the files in Porter's office with reference to the lease on the "Rabbit Hill" deposit, which was based on an agreement between Porter Company and Kiblers of Lakeland, and a confirmatory letter by Porter to Kibler. Appellants' Exhibit No. 5-A is a letter agreement of what was to be transferred by the Porter Company to Kellogg Company, and is signed by the M. R. Porter Company. It recites, "This will include an assignment of *all leases which we now hold,* on certain phosphate lands."

The Kibler lease to "Rabbit Hill" deposit was discussed by the parties. The record reflects the testimony of Kellogg on this point viz:

"Q. What did Mr. Porter say about your continuing mining of it? A. Mr. Porter said if Kibler did object that we could continue to mine and we would pay him. We were to pay Mr. Porter. Q. How much were you to pay Mr. Porter? A. The same basis, 20c a ton. Q. And he would pass the money of M. R. Porter Company, a check, to Kibbler? A. That is right. Q. Did he state whether or not he would assure you of the right to mine that deposit under your purchase? A. Sir? Q. Did Mr. Porter give you any assurance that he would see to it that you were able to mine that deposit? A. That is just what he said. Q. Just repeat that? In other words, state as fully and accurately as you can what Mr. Porter told you about the arrangements for the mining of the Kibler deposit? A. He said he didn't think Mr. Kibler would object and if he did he would continue to mine and we

would pay the Porter Company and the Porter Company would pay Kibler. Q. By the way, don't you mean the Kellogg Company? A. Yes, sir. Q. Did you examine the contract of June 1, 1942 between Mr. Kibler and the M. R. Porter Company? A. Yes, sir. Q. Did you also examine the previous correspondence leading up to that? A. Yes sir. Q. Was there any provisions in that contract or correspondence for a ninety day cancellation? A. In Mr. Kiblers? Q. Yes. A. No, sir. Q. Did you and Mr. Porter agree or not upon the suggestion he made that you would continue to mine the deposit and if Mr. Kibler objected that you would pay him 20c a ton royalty and that he would remit it to Kibler? A. You say did we agree on that? Q. Yes. A. Yes, sir. Q. Well, what followed that understanding? A. Mr. Porter was kind of, I should say, urging me to get this thing signed up and get it over with, so on February 26, in the morning,—previous to that time Mr. Porter had been making up this list as a part of the contract— Q. You are referring to the schedule, which, I believe, is a part of Plaintiff's Exhibit No. 1, are you not? A. Yes, sir. Then I made up this one here. Q. Which one was made up first? A. This one. Q. That is the schedule? A. That is right. Q. Is that the schedule which contains this item 'Cleared Surfaces, approx. 15 acres, $1500.00?' A. Yes, sir."

On April 14, 1943, Kibler wrote M. R. Porter that he had received a check in the sum of $64.00 from The Kellogg Company to cover shipment of four cars of soft phosphate—presumably taken from the "Rabbit Hill" deposit. In the letter Kibler stated that he did not know The Kellogg Company, and sent The Kellogg Company check to the Porter Company and requested a check from the Porter Company. On April 21, 1943, M. R. Porter Company wrote the Kiblers viz:

"Yesterday we wired you as follows: 'Your recent letter. Sorry. Our check being mail immediately.' Since both Mr. Stephenson and I sign checks, it has been delayed because it was seemingly impossible for us to get together. This morning he left a signed check for $64.00 in my office, and you will find it enclosed. The property has not been leased to

The Kellogg Co., or any-one else. Mr. Stephenson also works for The Kellogg Co. and thru error mailed their check instead of our own."

The record reflects a harmonious course of business dealings as between the parties until about April 14, 1943, when M. R. Porter received a letter from Kibler transmitting to him The Kellogg Company royalty check. Kellogg personally interviewed Mr. Porter at a hardware store in Ocala after April 14, 1943, and before April 30, 1943. What was said between the parties with reference to the inclusion of the "Rabbit Hill" deposit in this conversation is in dispute, but the letter of April 30, 1943, addressed to The Kellogg Company made it clear that Porter contended that the lease was not included.

The testimony of E. H. Kellogg and Embry W. Stephenson is clear, positive and certain that the "Rabbit Hill" deposit was included in the trade. Their testimony is corroborated by letters and written documents or instruments introduced into evidence. The decree here challenged must rest almost exclusively on the testimony of M. R. Porter. It is not corroborated by much of the written evidence in the record. It is contradicted, disputed and inconsistent with not only a good deal of the written evidence but by the testimony of Mr. Porter's partner, Mr. Stephenson. We thus have two witnesses and strong corroborative evidence to the effect that the "Rabbit Hill" deposit was included in the trade, and Mr. Porter's testimony to the contrary.

In the case of Farrington v. Harrison, 95 Fla. 769, 116 So. 497, we said:

"We also bear in mind the oft reiterated rule that while the findings of the chancellor on the facts where the evidence is heard by him, and the witnesses are before him, are entitled to more weight in the appellate court than where such findings are made in a cause where the testimony was not taken before the chancellor, yet in either case the chancellor's findings should not be disturbed by an appellate court unless shown to be clearly erroneous. Sandlin v. Hunter Co., 70 Fla. 514, 70 South. Rep. 553; Travis v. Travis, 81 Fla. 309, 87 South. Rep. 762; Lucas v. Wade, 43 Fla. 419, 31 South.

Rep. 23. On the other hand, where a decree is manifestly against the weight of the evidence or contrary to and unsupported by the legal effect of the evidence, then it becomes the duty of the appellate court to reverse such decree. Carr v. Leslie, 73 Fla. 233, 74 South. Rep. 208; Florida National Bank v. Sherouse, 80 Fla. 405, 86 South. Rep. 279; Gill v. Chappelle, 71 Fla. 479, 71 South. Rep. 836; Lightsey v. Washington Park Properties, 112 South. Rep. 555."

It is our conclusion, after a studious and careful consideration of the entire record, that the challenged decree is manifestly against the weight of the evidence—it is not supported by the legal effect of all the evidence, and it therefore becomes the duty of this Court to reverse the final decree assigned as error on this appeal as not being supported by the record.

The final decree appealed from is hereby reversed with directions to the lower court to dismiss the amended bill of complaint.

It is so ordered.

BUFORD, C. J., TERRELL, CHAPMAN and SEBRING, JJ., concur.