ELSIE W. STUBBLEFIELD, by and through her husband and next friend, WM. H. STUBBLEFIELD v. DORIS D. DUNLAP, and HENRY V. DUNLAP, her husband.

DORIS D. DUNLAP and HENRY V. DUNLAP, her husband v. ELSIE W. STUBBLEFIELD, and WM. H. STUBBLEFIELD, her husband.

(Two Cases)
4 So. (2nd) 519
Division B
Opinion Filed November 4, 1941
Rehearing Denied November 28, 1941

402

*Murrell & Malone,* for Appellants and Cross-Appellees.

*Botts & Field,* for Appellees and Cross-Appellants.

THOMAS, J.—This litigation having become somewhat complex by reason of the institution of a suit by certain mortgagors to set aside three mortgages on the ground that they were usurious, the filing of a bill by the mortgagees to foreclose one of the mortgages, the order of the chancellor consolidating the causes, a decree eventually entered partly favoring the plaintiffs and partly the defendants, and an appeal by one set of parties and a cross appeal by the other, we will, to avoid confusion in comprehending our decision, refer to the parties as the "lender" and the "borrower." We are well aware that the controversy is nominally one between a man and his wife and another man and his wife, the wives having been joined because of the status of the title and the execution of

the various instruments, however, the decision was not dependent upon any individual rights of the married women therefore there is no need to make a distinction here in our reference to the parties litigant, so we, therefore, refer to them in the singular.

The borrower was the first to institute litigation involving the transaction he had entered with the lender wherein there was an exchange of a deed from the latter for a mortgage executed by the former. The bill of complaint charged that that instrument, given to secure the sum of $13,500, was void because of usury and that two subsequent mortgages in the sums of $2000 and $450, respectively, should for the same reason be declared invalid and cancelled of record as clouds on the title of the mortgagors. Shortly afterward the mortgagees brought their suit to foreclose the first mortgage and in it the defense of usury was presented. The causes were consolidated and after the chancellor had heard the testimony he entered a final decree ordering the first mortgage cancelled and establishing in lieu thereof a vendor's lien in the sum of $4500; also holding the second mortgage invalid and declaring the third mortgage in the sum of $450 enforceable.

Although many questions have been presented and argued in the briefs there is but one which we are obliged to determine, namely, the presence or absence of usury in the transaction which we will describe.

At the outset it is well to state that the business of the borrower was to construct houses for the purpose of resale and, in fact, the lender occupied one that he had bought from him. The lender or his spouse, owned the property involved in the suit and sold it to the borrower, at the same time agreeing to

furnish the money which was estimated necessary to construct a suitable house so that the entire property might be sold to the pecuniary advantage of the borrower. As the construction progressed the amount of cash originally agreed to be advanced by the lender, seven thousand dollars, was exhausted and it became necessary for the borrower to secure further sums to complete the building. Thereupon the lender advanced fifteen hundred dollars more. Again the money was exhausted and an additional sum of four hundred and fifty dollars was lent. The discrepancy between the amount of fifteen hundred dollars actually delivered under the second mortgage and the sum of two thousand dollars secured will be explained as we proceed.

There is a clash in the versions of the borrower and the lender about the items included in the first mortgage of seven thousand dollars. There seems to be no conflict about the amount of cash that was to be paid by one and expended by the other, namely, seven thousand dollars, but it is the contention of the lender that the purchase price of the lot was sixty-five hundred dollars while the borrower insists that the agreed value of the property was forty-five hundred dollars and that the disparity of two thousand dollars represented a bonus which made the transaction usurious. We are not aware of any plausible reason why one in the position of the lender, who was selling a piece of property and lending the money to improve it, would make the choice of designating the purchase price forty-five hundred dollars and exacting a bonus of two thousand dollars when, without any difference whatever to the borrower, the purchase price could be

fixed at sixty-five hundred dollars, the cash payment in each case being the same.

To us a comparison of the two stories told by the borrower and the lender make the one of the former so illogical as to be unworthy of credit. As we have already said the borrower was not necessitous. He faced no emergency requiring ready cash. He was simply entering a transaction in a business with which he was thoroughly familiar and from which he made his livelihood, that is, the construction of houses for sale. It may be that the lender was getting an excessive price for his property and was happy at the prospect but we are not able to find in the testimony a sufficient basis for the charge that that was but a device to violate the statute condemning usury. We feel that it is entirely proper for us to bear in mind not only the letter but the spirit of the usury law and its prime purpose to protect needy borrowers by penalizing unconscionable money lenders. Chandler *et ux.* v. Kendrick, 108 Fla. 450, 146 So. 551.

The lender had been in business for twenty-five years and it is difficult to believe that any one of his experience would have been so stupid as to deliberately violate the law against usury in the manner charged by the borrower and face the possibility of forfeiting his investment or a part of it when it would have availed him absolutely nothing to take that course.

The record shows that after the house was completed the borrower had an opportunity to sell at a price which was approximately the amount of his investment but he refused because the profit was not sufficient. We may assume that the lender, as well as the borrower, had ordinary common sense and it

would do great violence to that asumption to hold that where one could choose between fixing a purchase price of sixty-five hundred dollars or one of forty-five hundred dollars, where the cash advanced to the borrower was the same and the ultimate amount of the mortgage identical, he deliberately selected the latter method and thereby put himself in a position where he risked the loss in his investment. This is particularly true when it is considered that the borrower, as well as the lender, was thoroughly schooled by experience in the business in which he was then engaging. It seems to us that the transaction if given the interpretation urged by the borrower would have shown uncommon nonsense on the part of the lender.

The burden was at all times upon the borrower to establish the existence of usury and although we have repeatedly expressed our reluctance to disturb the findings of the chancellor upon points of fact, nevertheless, we do reserve always the right to interfere where his conclusions are clearly erroneous, "manifestly against the weight of the evidence or contrary to the legal effect of the evidence." Newman v. Smith, 77 Fla. 633, 82 So. 236. We cannot agree that the decision of the chancellor on this aspect of the case consonant with a proper construction of the legal effect of the evidence we have analyzed.

As has been noted the second and third mortgages were described in the bill of complaint brought by the borrower but were not attempted to be foreclosed in the suit of the lender. It is true that the second mortgage was given for two thousand dollars while but fifteen hudnred dollars of that amount was actually paid to the borrower for the continuance of the

construction of the building. The story of the lender is that when he was importuned to advance additional funds in order to carry on the construction he did not have the money and approached a friend who offered to lend the amount needed but stated that to do so it would be necessary for him to sell certain of his securities. It was then agreed, so this story goes, that he would procure the money by the sale of the securities if five hundred dollars were held to pay any loss which he would suffer between the time the securities were sold and the time he was able to repurchase them after repayment of the loan. It is strange that no instruments were executed evidencing the obligation of the lender to his friend nor was any memorandum made of the arrangement to retain five hundred dollars to cover possible losses from the sale of the securities. It is significant that the borrower was not a party to that agreement and his mortgage was executed to secure the amount of two thousand dollars. Thus, if this mortgage were foreclosed a decree would be entered to sell the land in the default of the payment of the principle amount of two thousand dollars and the interest on it, although the borrower in the meantime would have received only three-fourths of the amount of the mortgage and there is no definite plan indicated in the record showing how and when the cost of the repurchase of the securities was to be determined except that, presumably, the loss, if any, should be fixed at the time the lender settled with his creditor in accordance with a private negotiation between them to which the borrower in this suit was not a party. By such an arrangement the borrower could lose his property by foreclosure before the determination of any loss and,

for that matter, in the absence of loss in the event the securities should increase instead of decrease in value. The chancellor was decidedly correct in his interpretation of this phase of the case and the provisions of his decree dealing with the second mortgage will not be disturbed.

Likewise, the third mortgage of four hundred and fifty dollars was not sought to be foreclosed and from the record we are convinced that the chancellor was correct when he found that this indebtedness had not been discharged. It is well proven that the amount represented was actually paid to the borrower and used in the construction. He was correct in holding that no taint of usury could be visited on the third mortgage.

It is our order that the cause be reversed with directions to the chancellor to reform his decree insofar as it declared the first mortgage usurious and to proceed with the foreclosure of that instrument.

BROWN, C. J., TERRELL and CHAPMAN, J. J., concur.